SOULE GLASS AND GLAZING CO.,
et al., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 79–1640.

United States Court of Appeals,
First Circuit.

Argued Sept. 3, 1980.

Decided May 7, 1981.

Alan J. Levenson, S. Portland, Me., with whom Levenson & Levenson, S. Portland, Me., was on brief, for petitioners.

Eric Moskowitz, Washington, D. C., Atty., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for respondent.

Before CAMPBELL, Circuit Judge, WYZANSKI, Senior District Judge,* and KEETON, District Judge.*

KEETON, District Judge.

In this appeal, Soule Glass and Glazing Company and three related Soule firms [1] ("the company") petition this court to review and set aside an order of the National Labor Relations Board ("the Board") finding the Company guilty of a number of unfair labor practices. The Board cross-applies for enforcement of its order. The case presents, in the words of petitioners' brief, "a virtual compendium" of the labor law issues implicated by an employer's operation during a strike.

### I.

A summary of the history of the company and the labor dispute at issue provides the necessary context for our review of the Board's decision.

Soule Glass and Glazing Co. is one of several corporations owned by the Soule family, all of which are engaged in various facets of the glass and related businesses in the state of Maine. The present corporate structure evolved, under the direction of

---

* Of the District Court of Massachusetts, sitting by designation.

1. The Board's decision describes the employer as "Soule Glass and Glazing Co.; Soule Glass Industries; Soule Replacement Co. and/or Presque Isle Glass d/b/a Soule Glass and Glazing." The functions and relationship of the various Soule companies are discussed *infra.*

Charles Soule, from the original Soule Glass and Paint Company ("SGP"). Following several acquisitions and a reorganization in 1975, the parent company was renamed Soule Glass Industries ("SGI"), and the business was organized into two operating divisions, King & Dexter (hardware, glass cutting and fabrication, and metal fabrication) and SOAGCO (auto glass), and a wholly-owned subsidiary, Soule Glass and Glazing ("SGG").[2] Charles Soule became president of SGI, Edward Churchill became president of SGG, and Andrew Soule, Charles Soule's cousin, was named SGG's treasurer. SGG took over the business of installing glass and framing on new construction projects ("contract work") as well as the replacement of broken glass in existing buildings ("replacement work").[3] SGG operated from various facilities in Portland, Lewiston, Waterville, and Bangor.

Petitioners' relationship with Glaziers Local 1516, International Brotherhood of Painters and Allied Trades, AFL–CIO ("the union") has been long, if not harmonious. SGP's Portland employees have been represented by the Union since 1945. In 1969, following a strike, SGP entered into a three-year collective bargaining agreement for a unit of "all glaziers, apprentice glaziers, inside glass workers, metal fabricators, and truckdrivers, excluding all office clerical employees, salesmen, professional employees, guards and supervisors" at SGP's various locations. Following another strike in 1973, petitioners and the Union negotiated three separate three-year contracts for three separate units: SGP (succeeded by SGG), King & Dexter, and SOAGCO. Each of these contracts was to expire March 31, 1976. However, the employees of King & Dexter and SOAGCO voted to oust the Union, resulting in the decertification of the union in these units on March 24, 1976.

On February 21, 1976, the union began bargaining with SGG for a contract to replace their 1973 agreement, covering bargaining unit employees engaged in outside glazing on new construction and replacement jobs. In all, 17 bargaining sessions were held. By the fifth session, on April 9, the parties had reached at least tentative agreement on all issues except wages and the duration of the contract, with the union demanding a $1.10 per hour raise in the minimum glaziers' pay rate for a one-year contract, and the company offering a two-year contract with increases at six month intervals of 15 cents, 10 cents, 15 cents, and 10 cents per hour. The Union rejected this offer, and on the morning of April 12, 1976, the bargaining unit employees of SGG went on strike. That afternoon, Charles Soule approved a flat 25 cents-per-hour pay raise, retroactive to April 1, for all the (nonstriking, non-unit) employees of the King & Dexter and SOAGCO divisions of SGI.

For about the first month of the strike, SGG operated on an ad hoc basis, with supervisors and borrowed SGI personnel working long hours to fulfill the company's contractual glass installation obligations. Replacement work was initially neglected, and the company subcontracted certain work. Starting in mid-May, 1976, SGG began to hire permanent replacement employees to do outside glazing work formerly done by the striking bargaining unit employees.

On May 6, 1976, at the first post-strike bargaining session, the company announced its intention to close SGG's Lewiston and Waterville shops for economic reasons, and to have the employees on each of the affected crews report directly to jobs from their homes. Because of the closings, the Company proposed to divide the state into two wage zones instead of the three previously

---

**2.** Charles Soule in 1975 also formed another wholly-owned SGI-subsidiary, Presque Isle Glass, to perform glass work in the city of Presque Isle.

**3.** The contract glass installation and glass replacement work performed by SGG employees is referred to as "outside" work; glass cutting and fabrication and metal fabrication constitutes "inside" work. "Outside glaziers" were generally higher paid than "inside glass workers."

agreed to.[4] The Union rejected the two-zone proposal. At the May 6 meeting and thereafter, there was considerable discussion as to the effects of the Lewiston and Waterville closings on the employees at those locations.

At negotiating sessions on May 7, 1976, the union made a wage proposal for a three year contract with 26 cent increases every 6 months the first year, 29 cents every six months the second year, and one 54 cent increase in the third year. The company rejected this proposal, and offered a two year contract with six month increments of 20 cents, 15 cents, 21 cents, and 15 cents, which the union rejected. Thereafter, the company never increased this offer. Subsequently, at sessions on June 18, August 27, and October 18, the union reduced its wage demands to 90 cents for a one year contract, then to 80 cents for a one year contract, and finally 80 cents per year for a two year contract, respectively. The company rejected each of these offers, and no further progress was made toward resolving the wage issue.

In addition to the wage increase and the Lewiston-Waterville closing, several incidents during the strike and concomitant negotiations gave rise to unfair labor practice charges against the company. Early in the strike, pursuant to a "marketing concept" he had evolved for the Soule Companies,[5] Charles Soule formed Soule Glass Replacement Company ("SGR"), a wholly-owned subsidiary of SGI combining the former King & Dexter and SOAGCO divisions. "Replacement centers" were set up as early as April 1976, and the transfer of a majority of the replacement work formerly done by SGG employees took place in May and June. Whether this transfer of bargaining

unit work was implemented as a permanent change (and if so, at what point it became so) or was instead a temporary response to the exigencies of the strike is disputed. The existence of SGR and the company's "proposal" to transfer permanently the majority of SGG's replacement work was first disclosed to the union in an "agenda" distributed by the company's attorney at the August 6 bargaining session. The agenda proposed changes in a number of noneconomic areas on which agreement had previously been reached, including work jurisdiction, elimination of the apprenticeship plan, company discretion as to new employees' wages (above contractual minimum), modification of the grievance and arbitration clauses, and addition of a no-retaliation clause. The union made no immediate response to the specifics of the agenda.

On June 25, 1976, SGG president Edward Churchill and manager Edward Tribou were involved in two incidents involving confrontations with picketing strikers. Following lunch at a Bangor restaurant, Churchill and Tribou drove to SGG's Bangor facility, where a striker's vehicle was allegedly parked on company property. Following some discussion with strikers Carleton French and Harold Douglas, Tribou seized a picket sign that was leaning against a truck windshield and threw it into the street. Churchill then attempted to persuade the two strikers to return to work, allegedly offering raises of first ten cents and then one dollar, and inviting both to discuss the matter later over drinks. After both pickets refused, Tribou directed insults at the two and he and Churchill departed. Churchill and Tribou then drove to SGG's nearby Hampden facility, where Tribou again seized the strikers' picket signs and

---

4. As reflected in previous contracts, SGG glaziers at the company's four locations historically had three different wage scales, with the highest wages in Portland, the lowest in Bangor, and an intermediate wage at Lewiston-Waterville. Glaziers were paid on the basis of which shop they came from, rather than where the particular job on which they were working was located. In negotiations prior to the strike, the parties had agreed to divide the state into three "wage zones," whereby glaziers

would be paid on the basis of which zone they were working in, not where they came from.

5. Charles Soule's objective was to effect a division of labor whereby SGI became a wholesaler of glass, metal framing and related products, SGG did exclusively contract work on new construction projects, and the newly-formed SGR combined all auto glass installation and broken window replacement work.

threw them on the ground. Churchill allegedly grabbed picket Nick Botzko, a robust 60 year old man, around the neck and held Botzko's head down as if preparing to punch him. Striker Michael Nadeau at that point jumped from a concealed position behind an air compressor and Churchill released Botzko. Tribou made various abusive and threatening remarks to Nadeau, and departed with Churchill. These incidents were reported to the union membership at a meeting held shortly thereafter.

During the November 22, 1976 bargaining session, the union's attorney (Cohen) requested that the company provide certain wage and hour information to permit the union to evaluate the company's wage position. The company's attorney (Levenson) told the union to put its request in writing. On November 23 Cohen wrote Levenson requesting wage and hour data for all nonstriking employees of SGI, SGR, and SGG. At the December 9 bargaining session, Levenson gave the union a written reply, stating that the company was furnishing the wage rates (without names) and aggregate weekly overtime hours of all SGG employees, but declining to furnish any information regarding the nonunion SGI and SGR employees. December 9, 1976 was the final bargaining session.[6]

On March 8, 1977, attorney Cohen wrote to attorney Levenson on behalf of the strikers, unconditionally applying for the immediate reinstatement of 22 named individuals, and proposing to resume negotiations. Levenson responded on March 10 with a letter stating that the request "must be studied carefully before making a definitive reply," that Andrew Soule would like to interview individually each of the strikers applying for reinstatement, and suggesting possible dates for a bargaining session. On March 11, Cohen wrote Levenson emphasizing that the request was for reinstatement of the named strikers "as a group" to their former or equivalent jobs and asserting that as unfair labor practice strikers they were entitled to reinstatement as of right and that conditioning reinstatement on individual interviews was unlawful. Cohen agreed to meet on March 28, 1977 for further negotiations. Levenson by letter of March 21 notified the union that striker David Bates, whose name was among the 22 reinstatement applicants, was being terminated for strike misconduct and would not be reinstated.

On March 25, 1977, Levenson again wrote Cohen, this time informing him that the scheduled meeting would be "without purpose," in that, because of the company's "doubts that Local 1516 continues to represent the bargaining unit at Soule Glass and Glazing Company," the company was withdrawing its recognition of the union as bargaining representative. The company stated it would, "upon proper application," reinstate strikers when openings occurred.

On June 27, 1977, the Board's Regional Director issued a consolidated complaint, consolidating five sets of unfair labor practice charges brought by the union against the company during the negotiations and strike.[7] Specifically, the complaint, as later amended, charged the company with violating § 8(a)(1) of the Act by increasing wages of nonstrikers, assaulting a picketing striker, and offering wage inducements to picketing strikers; violating § 8(a)(1) and (5) by unilaterally combining wage zones, refusing to supply relevant requested information, withdrawing recognition of the union, and unilaterally permanently reassigning bargaining unit work to nonunit employees; and violating section 8(a)(3) and (1) by re-

6. On March 18, 1977, pursuant to a settlement agreement approved by the Board's Regional Office, the company supplied the union with wage information on SGG's employees before the strike, and the names and hours worked by week of each striker replacement and other company employees who had performed some glass replacement work during the strike.

7. As noted in the complaint, the cases arising from three of the union's charges were settled and the settlement agreements were approved by the Regional Director. However, on June 14, 1977, the Regional Director revoked his approval, set aside the settlement agreements, and reopened the cases, following the regional office's investigation of subsequent charges filed by the union.

fusing to reinstate the strikers. The complaint makes no mention of the Lewiston-Waterville shop closings, and does not charge bad faith bargaining as an independent violation.

The case was heard before an Administrative Law Judge ("ALJ") at a ten day hearing in November and December, 1977. On July 9, 1979, the ALJ issued his decision and remedial order finding the company guilty of a number of unfair labor practices. On December 5, 1979, a three member panel of the Board summarily affirmed, in a brief order without opinion, and with one minor modification, the ALJ's findings, conclusions, and order.

## II.

### Standard of Review

Section 10(e) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(e), provides that "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive." As interpreted by the Supreme Court in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), " '[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* at 477, 71 S.Ct. at 459. In searching "the whole record" for substantial evidence, a reviewing court "must take into account whatever in the record fairly detracts" from the Board's fact finding as well as evidence that supports it. *Id.* at 487–88, 71 S.Ct. at 464–465. The court may not substitute its judgment for that of the Board when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*," and must defer to the Board's inferences in the Board's areas of specialized experience and expertise. *Id.* at 488, 71 S.Ct. at 465. However, it is appropriate to set aside the Board's decision when the court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Id.* at 488, 71 S.Ct. at 465. As to mixed questions of law and fact, such as the inferences drawn by the board from the evidence (*e. g.*, motive) or the application of a statutory standard to particular factfindings (*e. g.*, bargaining in good faith), the court must sustain the board's conclusions if reasonable. *See, e. g., Famet, Inc. v. NLRB*, 490 F.2d 293, 295 (9th Cir. 1973); *NLRB v. Marcus Trucking Co.*, 286 F.2d 583, 592 (2d Cir. 1961).

In light of these criteria we review the Board's findings of fact and conclusions of law.

## III.

### Procedural Due Process

Petitioners challenge several of the Board's unfair labor practice findings against them as violative of due process, in that these violations were not charged in the General Counsel's amended complaint. In particular petitioners attack on due process grounds the "course of conduct" violation, held to violate § 8(a)(5) and (1); the additional finding of a § 8(a)(5) violation with respect to the wage increase when only § 8(a)(1) was charged; and the § 8(a)(5) and (1) violations found regarding "reneging" on the three wage zone agreement and the Lewiston-Waterville closing. Although we deal with each of these claims individually in later sections of this opinion, it is useful to set forth initially the analytic framework common to all such claims.

Due process requires that persons charged with unlawful conduct be given prior notice of the charges and an opportunity to be heard in defense before the government can take enforcement action. For federal agency adjudications, the Administrative Procedure Act, 5 U.S.C. § 554(b)(3), provides that "[p]ersons entitled to notice of an agency hearing shall be timely informed of ... the matters of fact and law asserted." The NLRB's own rule, 29 C.F.R. § 102.15, requires that "[t]he complaint shall contain ... a clear and concise

description of the acts which are claimed to constitute unfair labor practices, including, where known, the approximate dates and places of such acts and the names of the respondent's agents or other representatives by whom committed." The General Counsel's complaint, which may be liberally amended, is designed to notify the adverse party of claims to be adjudicated so he may prepare his case, and sets the standard of relevance at the hearing before the ALJ. *Douds v. International Longshoremen's Ass'n*, 241 F.2d 278, 283 (2d Cir. 1957).

Due process prohibits the enforcement of a finding by the Board of a violation "neither charged in the complaint nor litigated at the hearing." *NLRB v. H.E. Fletcher Co.*, 298 F.2d 594, 600 (1st Cir. 1962); *Boyle's Famous Corned Beef Co. v. NLRB*, 400 F.2d 154, 162 (8th Cir. 1968). Stated in the strongest terms, "[f]ailure to clearly define the issues and advise an employer charged with a violation ... of the specific complaint he must meet and provide a full hearing upon the issue presented is ... to deny procedural due process of law." *J.C. Penney Co. v. NLRB*, 384 F.2d 479, 483 (10th Cir. 1967). The adversary process employed in NLRB adjudication is premised on having a neutral, impartial trier of fact, with the General Counsel serving as prosecutor. The ALJ may not, in effect, become a litigant by "prosecuting" uncharged violations. Although the ALJ may, in his discretion, "call attention to an uncharged violation or decide an uncharged violation *which has been fully litigated by the parties*, ... he should [not] undertake to decide an issue which he alone has injected into the hearing, especially where, as here, the parties were never advised to litigate the issue." *NLRB v. Tamper, Inc.*, 522 F.2d 781, 789–90 (4th Cir. 1975) (emphasis in original) (denying enforcement because ALJ's action "so inherently prejudicial").

However, courts have recognized "the Board's power to decide an issue that has been fairly and fully tried by the parties, despite the fact that the issue was not specifically pleaded," *Drug Package, Inc. v. NLRB*, 570 F.2d 1340, 1345 (8th Cir. 1978);

and have gone so far as to state that the Board "has an obligation to decide material issues" which were fully litigated although not specifically pleaded. *American Boiler Manufacturers Ass'n v. NLRB*, 404 F.2d 547, 556 (8th Cir. 1968), *cert. denied*, 398 U.S. 960, 90 S.Ct. 2162, 26 L.Ed.2d 546 (1970). *See NLRB v. Puerto Rico Rayon Mills Inc.*, 293 F.2d 941, 947 (1st Cir. 1961) (issue obvious, fully litigated, no prejudice shown). Inconsequential or technical variances between the phraseology or characterization of the violation charged and the violation found are not a valid defense where it is clear the respondent "understood the issue and was afforded full opportunity to justify [its actions]," *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 350, 58 S.Ct. 904, 913, 82 L.Ed. 1381 (1938); *REA Trucking Co. v. NLRB*, 439 F.2d 1065, 1066 (9th Cir. 1971).

Thus, the test is one of fairness under the circumstances of each case— whether the employer knew what conduct was in issue and had a fair opportunity to present his defense. For example, if the identical employer conduct gave rise to two violations, the legal elements of which overlap substantially, and only one was charged, under some circumstances it may be fair to say that both were "fully litigated." However, in *Drug Package*, 570 F.2d at 1345, the court held that an issue was "not fairly litigated" because

[a]lthough the underlying facts were litigated, the Company at the time of the hearing, was aware only of the possibility that the Board would find an 8(a)(1) violation .... Had the Company been given notice of the possibility of an 8(a)(5) violation and the resulting additional penalties, it might have litigated the matter differently.

In this regard, the Court of Appeals for the Tenth Circuit recently noted:

Many labor dispute cases involve multiple charges based on a variety of occurrences. This case was complex and confusing— there were not only a number of charges but a change of ownership, .... Simply because violations could have been al-

leged in addition to those in the complaint does not obligate the employer to defend against all possibilities. *NLRB v. Pepsi-Cola Bottling Co. of Topeka*, 613 F.2d 267, 274 (10th Cir. 1980). This observation is particularly pertinent to the instant case, in which eight instances of employer conduct were charged as violating some or all of three provisions of the statute, and where the hearing consumed ten trial days.

In light of these standards, we find it necessary to reverse several of the unfair labor practice charges found by the ALJ. *See* Parts V(B), VI(A), and IX(A), *infra*.

### IV.

#### Single Employer

The Board held that SGI and its subsidiaries, SGG and SGR, constituted a "single employer" for the purposes of the Act. There is apparently no dispute as to the criteria upon which the single employer issue is to be determined.

"[T]he Board considers several nominally separate business entities to be a single employer where they comprise an integrated enterprise.... The controlling criteria, ... are [1] interrelation of operations, [2] common management, [3] centralized control of labor relations and [4] common ownership." *Radio & Television Broadcast Union v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam). This court has noted that the Board's "single employer" conclusion "is 'essentially a factual one' and not to be disturbed provided substantial evidence in the record supports the Board's findings." *NLRB v. C.K. Smith & Co.*, 569 F.2d 162, 164 (1st Cir. 1977) (noting that "the sale of essentially similar products via similar distribution

methods is also probative of integration"), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). The "single employer" finding depends on "all the circumstances of the case," and none of the above factors is controlling. *NLRB v. Don Burgess Construction Corp.*, 596 F.2d 378, 384 (9th Cir.), *cert. denied*, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979).[8]

Perhaps the most important of the above criteria, in the Board's eyes, is the degree of centralized control over labor relations policies, although this alone is not determinative. *Local 627, Operating Engineers v. NLRB*, 518 F.2d 1040, 1046 (D.C. Cir.1975), *aff'd in part and vacated in part*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976). In *Local 627*, the Court of Appeals reversed the Board's finding of separate employers, relying on the facts that the two companies were wholly-owned operating subsidiaries of the same parent, in related businesses, with an "interchange of key personnel" and some "instances of interchange of employees," and "a substantial qualitative degree of interrelation of operations and common management—one that we are satisfied would not be found in the arm's length relationship existing among unintegrated companies." *Id.* at 1047. The Supreme Court affirmed the single employer holding. 425 U.S. at 802–03, 96 S.Ct. at 1843–1844. *See Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1043 (8th Cir. 1976) ("A more critical test is whether the controlling company possessed the present and apparent means to exercise its clout in matters of labor negotiations by its divisions or subsidiaries ...."); *Sakrete of Northern California, Inc. v. NLRB*, 332 F.2d 902, 907 (9th Cir. 1964) ("If there is overall control of critical matters at the policy level, the fact that there are variances in local management decisions will not defeat applica-

---

8. It is important to distinguish between the concepts of single employer and single bargaining unit. Under § 9(a) of the Act, a bargaining unit means a group of jobs constituting an election constituency; it is comprised of jobs and job classifications, not people, and the Board ascertains what is an "appropriate" bargaining unit under a "community of interest" standard. R. Gorman, Labor Law 66–69 (1976). A bargaining unit may, for example, constitute some subgroup of jobs in a particular plant. "The fact that two companies have been designated a single employer for purposes of the act is not determinative as to whether both ... constitute a single bargaining unit." *Don Burgess Construction*, 596 F.2d at 386.

tion of the 'single employer' principle"), *cert. denied*, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965).

The ALJ found, in support of his conclusion that the Soule companies were a single employer, (1) that the 1976 corporate structure had evolved from a common ancestor, Soule Glass and Paint; (2) that the corporations had an "interlocking relationship," by virtue of "the interrelation of operations and common flow of management personnel from one corporation to another"; (3) that "the ownership and financial control of the various Soule enterprises rests solidly in the hands of the Soule family, and that the majority stockholder of the SGI [which owns all of the stock of SGG and SGR] is Charles Soule"; (4) that "on limited occasions there was employee interchange" and "interchange of equipment, particularly trucks"; (5) that in certain instances SGG shared premises with another Soule enterprise; and finally (6) as to "the critical factor of centralized control of labor relations," that "Charles Soule is the person who has and exercises the power to make the major decisions, including labor relations decisions, for the entire Soule complex, including SGG."

■ Each of these findings is supported by substantial evidence in the record. In each instance the ALJ based his finding on specific testimony, which he reasonably credited. Since the Board's findings satisfy each of the criteria set forth in *Broadcast Union, supra*, we affirm the ALJ's holding that SGG, SGR, and SGI may be considered a single employer.

■ The ALJ did not make clear his view of the significance of this holding to the other issues in the case. We note, however, that the single employer finding enhances the relevance, to the labor dispute between SGG and the union, of certain corporate actions whose primary impact occurred beyond the corporate boundaries of SGG (*e. g.*, the wage increase and the creation of SGR), and may provide the basis for corporationwide relief.

## V.

### *The Wage Increase*

The ALJ found, on the basis of Charles Soule's testimony and the timing and amount of the wage increase, that the granting of 25 cent-per-hour pay increases to non-striking SGI employees on the first day of the strike violated § 8(a)(1) and (5) of the Act. Charles Soule stated that

April 12 arrived, and I became very aware of the fact that because ... certain picket lines were in front of our locations, that maybe it was time to act upon granting a wage increase. So I gathered the information and consulted with my payroll clerk ... [and] decided that a flat ten dollar, or 25 cent raise per hour was appropriate at that particular time.

Charles Soule also testified that annual pay increases for these employees historically had been granted around April 1, that an across-the-board 25 cent-per-hour raise was on the average just under a five percent increase, consistent with the company's wage policy, and that he was aware of the general status of the negotiations between the SGG and the union on the wage issue.

From these facts the ALJ concluded: Under these circumstances there can be little doubt that Respondent's intention was to emphasize to the strikers at the outset of the strike that it did not pay to support their Union. *Alba-Waldensian, Inc.*, 167 NLRB 695, 696; *Chanticleer, Inc.*, 161 NLRB 241, 252. I find that the Respondent violated Section 8(a)(1) and (5) of the Act on April 12 by granting this unilateral wage increase for nonstriking employees, greater than what was offered to employees in the bargaining unit.

### A. *The § 8(a)(1) Violation*

Under § 8(a) of the Act, 29 U.S.C. § 158(a), it is an unfair labor practice for an employer "(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title [basically to organize, join unions, bargain

collectively, and strike]," and "(5) to refuse to bargain collectively with the representatives of his employees . . . ."

The elements of a section 8(a)(1) violation are to be determined by reference to an objective test. It is *not* necessary to show that particular employees actually felt coerced, etc., or that the employer intended to produce the impermissible effect. *E. g., Russell Stover Candies, Inc. v. NLRB*, 551 F.2d 204, 207–08 (8th Cir. 1977) (reasonable tendency, not actual effect); *Crown Central Petroleum Corp. v. NLRB*, 430 F.2d 724, 729 (5th Cir. 1970) (employer motive not an element; *cf., Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1114–15 (7th Cir. 1973). Rather, "it is sufficient if the General Counsel can show that the employer's actions would tend to coerce a reasonable employee." R. Gorman, Labor Law 132 (1976). In addition, § 8(a)(1) requires a weighing of employer and employee interests. Employer conduct that otherwise tends to interfere, restrain or coerce employees "may be held lawful if it advances a substantial and legitimate company interest in plant safety, efficiency or discipline," or is "in accordance with plant custom or business necessity." *Id.* at 133. "[I]t is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a)(1) is violated." *Textile Workers Union v. Darlington Manufacturing Co.*, 380 U.S. 263, 269, 85 S.Ct. 994, 999, 13 L.Ed.2d 827 (1965).

It is settled that the grant or withholding of wage increases and other benefits, either discriminatorily or across-the-board to all employees, may violate § 8(a)(1). *E. g., NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409–10, 84 S.Ct. 457, 459–460, 11 L.Ed.2d 435 (1964) (grant of additional benefits to all employees before representation election for purpose of discouraging unionization); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 233–36, 83 S.Ct. 1139, 1148–1150, 10 L.Ed.2d 308 (1963) (post-strike award of super-seniority to striker replacements and nonstrikers); *NLRB v. Rubatex Corp.*, 601 F.2d 147, 149–50 (4th Cir.) (post-strike bonus to union and non-union nonstrikers), *cert. denied*, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979); *Aero-Motive Manufacturing Co.*, 195 NLRB 790 (1972), *enf'd*, 475 F.2d 27 (6th Cir. 1973) (post-strike bonus to non-striking union employees). The timing of such wage increases is a relevant factor in determining whether an employer's action violates § 8(a)(1). *See Russell-Newman Manufacturing Co. v. NLRB*, 407 F.2d 247, 251–52 (5th Cir. 1969) (wage increase at nonunion plant just after union won election at company's other plant violated § 8(a)(1)); *NLRB v. Fitzgerald Mills Corp.*, 313 F.2d 260, 268 (2d Cir.), *cert. denied*, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963) (unilateral wage increase to all (unionized) employees, announced contemporaneously with strike decision, violated § 8(a)(1) and (5)); *NLRB v. Otis Hospital*, 545 F.2d 252, 256 (1st Cir. 1976) (withholding promised wage increase from all employees during union organizing campaign violated § 8(a)(1)). The relevant inquiry is whether the wage increase impermissibly discriminated against the union by "demonstrat[ing] for the future the special rewards which lie in store for employees who choose to refrain from protected strike activity," *Aero-Motive, supra*, 195 NLRB at 792, and "[bringing] home in concrete fashion to those employees who were aware of it that it did not pay to become associated with the union," *Chanticleer, Inc.*, 161 NLRB 241, 252 (1966).[9]

On the other hand, an employer may lawfully treat differently union and nonunion employees or employees in different bargaining units, where a legitimate business justification is shown for such action, and absent evidence of bad faith or

---

**9.** In this respect there is considerable overlap between § 8(a)(1) and § 8(a)(3), which prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3), except that § 8(a)(3) typically requires a showing of antiunion motivation. *See* R. Gorman, *supra*, at 137–38. No § 8(a)(3) violation was charged regarding the wage increase.

antiunion motive. In *Chevron Oil Co. v. NLRB*, 442 F.2d 1067 (5th Cir. 1971), during the course of negotiations with the union the company granted nonunion employees wage increases and improved benefits and denied the same to union employees. The court denied enforcement of the Board's findings of § 8(a)(1) and (3) violations, stating, "... in a context of good-faith bargaining, and absent other proof of unlawful motive, an employer is privileged to withhold from organized employees wage increases granted to unorganized employees or condition their grant upon final contract settlement." *Id.* at 1074. Similarly, in *Omaha Typographical Union v. NLRB*, 545 F.2d 1138 (8th Cir. 1976), the court upheld the Board's dismissal of an 8(a)(1) charge regarding the employer's grant of selective bonuses to those who had worked long hours during a strike by the union. The court reasoned that "[d]isparate treatment of workers of *different units* provides no inference of discrimination .... [T]he bonuses were paid for a legitimate business purpose [*i. e.*, rewarding the extraordinary effort necessary to continue operations] which did not interfere with the exercise ... of the employees' § 7 rights to engage in strikes." *Id.* at 1144 (emphasis added).

 Although the issue is a close one, we hold that the Board's conclusion that the wage increase violated § 8(a)(1) is supported by substantial evidence. The timing of the increase (granted on the first day of the strike), its amount (an immediate, retroactive 25 cents-per-hour as compared to the six-month increments of 15 cents, 10 cents, 15 cents and 10 cents offered the union), and the evidence of causation (Charles Soule's testimony that the pickets prompted the wage increase) all support the conclusion that the employer's action would tend to interfere with and undermine a reasonable employee's exercise of the right to strike, and that this effect was at least clearly foreseeable, if not in fact intended.

To be sure, there are a number of countervailing factors which might have produced a reasonable conclusion to the contrary. Among these are the fact that the increase was granted only to non-bargaining unit employees of a different corporation [10] who had recently voted to decertify the union, the proffered business justification regarding the consistency of the timing of the increase with past practice, and the fact that the increase was not announced to the union (which could cut both ways). Also, we are troubled by the conclusory manner in which the ALJ asserts his certainty as to the employer's antiunion intention, and his reliance on a patently distinguishable case.[11] Notwithstanding these concerns, our review is a limited one, and we may not substitute our judgment for that of the Board. There is substantial evidence in the record supporting the ALJ's findings, and, giving due deference to the Board's experience and

---

**10.** The significance of the fact that SGI and SGG were distinct corporate entities is vitiated by our conclusion, in part II, *supra*, that the two were properly found to be a "single employer" for the purposes of the Act. Also, the evidence shows that the replacements for striking SGG bargaining unit members, when hired, also received wages 25 cents-per-hour higher than union members had previously received for the same job classification.

**11.** As is discussed in greater detail in part IX *infra*, *Alba-Waldensian, Inc.*, 167 NLRB 695 (1967), was a case in which the employer's grant of additional wages and benefits to employees in its unorganized plants while denying the same to the union was just one of many elements supporting a finding of overall course of bad faith bargaining. The wage increase was merely cited as additional evidence of bad faith and was not treated as an independent

violation. In this context the Board concluded that the company "utilized the pay raise to demonstrate to the [unionized] employees ... the impotence of the [union]." *Id.* at 696–97. *Alba-Waldensian* presents a pattern of employer behavior far more egregious in degree and kind than is disclosed by the record here. Here we find no evidence, independent of the fact that the wage increase was granted, to support the inference that the company's intention was to disparage and undermine support for the union, or that this action was part of an overall scheme of bad faith bargaining (*see* part IX *infra*).

Nevertheless, given that intent or motive is not an element of a § 8(a)(1) violation, cases like *Rubatex* and *Aero-Motive, supra*, do at least by analogy provide support for the Board's ultimate § 8(a)(1) conclusion.

expertise in such matters, we conclude that the ALJ's inferences as to causation, the probable effect of the wage increase upon the striking employees, and the employer's motivation are reasonable. Therefore, we affirm the ALJ's holding that the wage increase violated § 8(a)(1).

### B. *The § 8(a)(5) Violation*

██ To the extent that the additional § 8(a)(5) finding has independent force, however, we reverse on due process grounds the ALJ's holding that the wage increase also violated § 8(a)(5). No § 8(a)(5) violation was charged in the amended complaint with respect to the wage increase. The ALJ, acknowledging this fact, stated as justification that

> the facts upon which this additional finding of a Section 8(a)(5) violation is based are the same and were fully litigated. It is well established that an employer may violate Section 8(a)(5) of the Act during negotiations by the conduct of its supervisors and agents away from the bargaining table. *Chatham Manufacturing Company*, 172 NLRB 1948, 1978.

Accepting the validity of the latter proposition, we are unable to sustain the § 8(a)(5) finding. Because no explanation is given of how or why the wage increase additionally violated § 8(a)(5), we are unable to determine that this issue was in fact "fully litigated," notwithstanding the ALJ's conclusory assertion that it was. There is nothing in the record suggesting that the employer had notice at the hearing that its good faith in dealing with the union on and before April 12, 1976 was at issue. To the contrary, there are affirmative indications that the company's counsel believed and acted

on the justifiable assumption that it was not. *See* part IX *infra*. Due process forbids the ALJ from gratuitously injecting new issues into the case and deciding them *sua sponte. NLRB v. Tamper, Inc., supra,* 522 F.2d at 789–90. Moreover, on substantive grounds, it is not immediately apparent, in light of *Chevron, supra,* how granting a wage increase to non-unit non-union employees—with respect to whom there was no duty to bargain with the union—can of itself constitute a refusal to bargain in good faith, absent some other evidence of bad faith not present here.

### C. *Conversion of the Strike*

It is apparently undisputed, and the ALJ found, that "the strike was called because the wage issue was not settled and therefore was an economic strike at the outset." However, the ALJ found that the strike was "converted" to an unfair labor practice strike on its first day, April 12, 1976, by the company's unfair labor practice of granting the wage increase.[12] The ALJ notes that the wage increase was promptly reported to the union pickets by the nonstrikers, and was shortly thereafter discussed at a union membership meeting.

██ A strike begun in support of economic objectives becomes an unfair labor practice strike when the employer commits an intervening unfair labor practice which is found to make the strike last longer than it otherwise would have. *E. g., NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 840 (5th Cir. 1978); R. Gorman, *supra,* at 339. It must be found not only that the employer committed an unfair la-

---

**12.** The exact basis of the ALJ's finding of conversion is somewhat clouded. The relevant passage from the ALJ's decision reads as follows:

> *Beginning with the April 12 wage increase* the Respondent engaged in a *course of conduct* designed to disparage the Union in the eyes of its members, erode its strength, undermine its bargaining position, and ultimately destroy its majority. This course of action was highlighted by specific incidents of bad faith which have been discussed in detail [above] .... Consequently, I find that the strike was converted to an unfair labor prac-

tice strike on April 12 by Respondent's unlawful conduct, and was *thereafter prolonged* by the Respondent's unfair labor practices both at and away from the bargaining table. (Emphasis added.) It is thus unclear whether the ALJ found that the wage increase alone converted the strike or instead that it was the first of a sequence of events the combined force of which converted the strike as of the time of the first event, April 12. If the ALJ's finding is interpreted in the latter way, it is like a finding that the camel's back broke when the first straw was loaded. *See* note 14 *infra.*

bor practice after the commencement of the strike, but that as a result the strike was "expanded to include a protest over [the] unfair labor practice[ ]," *NLRB v. Top Manufacturing Co.*, 594 F.2d 223, 225 (9th Cir. 1979), and that settlement of the strike was thereby delayed and the strike prolonged. *Moore Business Forms, supra*, at 840. The central, and most problematic, element is causation—the effect of the employer's unlawful conduct on the union and its strike. Was the unfair labor practice a proximate cause of the lengthening of the strike? The burden of proof is on the General Counsel to demonstrate prolongation, and the Board's determination of conversion is reviewed under the usual substantial evidence standard. R. Gorman, *supra*, at 340. However, it need not be shown that the employer's unfair practice was "the sole or even the major cause or aggravating factor of the strike," but only that it was "*a contributing factor.*" *Moore Business Forms, supra*, at 840 (emphasis added). The new issue injected into the bargaining process by the employer's violation "need not be the sole cause for failure to agree." *Rogers Manufacturing Co. v. NLRB*, 486 F.2d 644, 649 (6th Cir. 1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974).

Both objective and subjective factors may be probative of conversion. Applying objective criteria, the Board and reviewing court may properly consider the probable impact of the type of unfair labor practice in question on reasonable strikers in the relevant context. Applying subjective criteria, the Board and court may give substantial weight to the strikers' own characterization of their motive for continuing to strike after the unfair labor practice. Did they continue to view the strike as economic or did their focus shift to protesting the employer's unlawful conduct? *See NLRB v. Broadmoor Lumber Co.*, 578 F.2d 238, 242 (9th Cir. 1978); *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691, 703 (7th Cir. 1976). However, in examining the union's characterization of the purpose of the strike, the Board and court must be wary of self-serving rhetoric of sophisticated union officials and members inconsistent with the true factual context. *See Colonial Haven, supra*, at 705; *Winter Garden Citrus Products Corp. v. NLRB*, 238 F.2d 128, 130 (5th Cir. 1956).

On the record before us, we are unable to sustain the Board's finding that the strike was converted by the April 12, 1976 wage increase. Although we have held that the wage increase was an unfair labor practice, our review does not disclose substantial evidence that this violation prolonged the strike. The ALJ's finding of conversion is both ambiguous and conclusory, *see* note 12 *supra*, and contains no finding as to causation or any discussion at all of evidence as to the *effect* of learning of the wage increase upon the strikers.

The only direct evidence bearing on the issue is the uncorroborated[13] testimony of union business agent Walter Dolbow, whom the ALJ credited generally, that the wage increase was discussed "at length" at the union membership meeting held about a week after April 12 and that the membership "agreed that they would not go back *at the wage package that the company had presented.* They felt that if they could give the non-striking employees this kind of an increase, we should have been at least offered the same thing" (emphasis added). Dolbow also testified that the membership was "all steamed up" at the meeting over the fact that management and SGI employees "were doing our work." Thus, it appears that the wage increase was only one of the things about which the members were upset in the first week of the strike. Fully crediting Dolbow's testimony and taking it at face value establishes that (1) the union would not accept the company's wage proposal (the unacceptability of which was the undisputed cause of the strike) and would remain on strike until the company increased its offer by some unspecified amount, and (2) that the 25 cent increase to the nonstrikers effectively set a "floor" be-

**13.** The General Counsel offered no other testimony as to the events at the union's post-strike meeting and the members' reaction to the wage increase.

low which the union, it can be inferred, would not settle. *Cf. NLRB v. Brazos Electric Power Coop.*, 615 F.2d 1100, 1101 (5th Cir. 1980). The first proposition merely reaffirms the economic nature of the strike. The most that could be inferred from the second, standing alone, is that the wage increase *may* have "aggravated [the company's] differences with the Union" on the crucial wage issue, *Kohler Co.*, 128 NLRB 1062, 1083–84 (1960), and thereby caused the union to hold out for a higher offer or to persist with higher demands than it otherwise would have. In context and without some further corroboration in the record, however, the latter inference is an unduly tenuous and speculative basis on which to hinge the Board's determination of the fundamental nature of the strike and the harsh remedial consequences that flow from such a determination.

 Given the scant and equivocal evidence of the union's contemporaneous reaction to the wage increase, it is appropriate to look to subsequent events and the overall context of the strike for indications as to whether the wage increase in fact prolonged the strike.[14] The record of the bargaining sessions after April 12 belies the claim that the 25 cent-per-hour wage increase prolonged the strike. The union's final pre-strike wage demand was an immediate $1.10-per-hour increase for a one year contract, a demand company attorney Levenson testified the union was "very serious about," because the SGG glaziers "felt themselves low men on the totem pole, in comparison with the whole country's glaziers." Thus, it appears that the union's relatively high wage demand, as compared to previous increases,[15] was not mere window dressing, but was a sincere position based on the strikers' perception that they were substantially underpaid.

That the union's predominant, if not sole, concern after April 12 remained improving substantially its members' wages, rather than protesting or redressing the company's favorable treatment of the nonstrikers, is indicated by Walter Dolbow's testimony regarding the first post-strike bargaining session on May 6, 1976. Dolbow stated that "[w]e were determined to increase our wages .... We wanted a decent increase"; and that "Jim [Holcroft, the Union's chief negotiator] stated that the main problem was money and our members were adamant to the point that we were not going to stay at the low point that we had been put by the company." Other union negotiators subsequently reiterated that wages were the critical issue, and for some time refused to discuss other issues. However, there is no indication in the record that the wage increase to nonstrikers was a major source of dispute or topic of discussion at any bargaining session, that it was used as a point of reference by the Union's negotiators for their demands, or that the wage increase was ever even discussed at the bargaining table. Indeed, it was not until July 27, 1976 that the union filed an unfair labor practice charge which included the wage increase.[16] Moreover, Dolbow tes-

---

**14.** The ALJ may have meant to apply a theory that later events contributed retroactively to converting the strike as of April 12. However, that theory cannot be sustained. As a factfinding it would be plainly erroneous. *See* note 12 *supra*. Nor can it be sustained as a legal proposition—that a conversion effectuated by later events should be treated in law as retroactively effective as of the date of the first event. Evidence of later events may be relevant to other issues, but it does not prove conversion at an earlier date. Conversion of a strike is a legal concept focused on the effect on strikers, which in turn leads them to prolong their strike. *See* p. 1080, *supra*. Thus, only when the essential effect has been accomplished does the conversion occur.

**15.** Under the previous (1973) contract, between 10/3/73 and 10/1/75 SGG employees received raises at six-month intervals of 20 cents, 10 cents, 10 cents, 10 cents, and 10 cents. At the time of the 1976 negotiations, the minimum SGG journeyman glazier's rates were: $5.40/hour (Portland), $5.20/hour (Lewiston-Waterville), and $5.15/hour (Bangor).

**16.** In the interim, on June 8 the union filed an unfair labor practice charge alleging the company's refusal to bargain in good faith, unilateral closing of the Lewiston-Waterville shops, and transfer of unit work to SGR; and on July 6 the union filed a charge regarding the alleged assault by supervisors Churchill and Tribou. The July 27 charge additionally charged that

tified that in February, 1977 (after 10 months of striking and 4 sets of unfair labor practice charges) he appeared on television news and told the reporter "something to the effect that the men on that job (being picketed) were working for substandard wages and that *we were on strike for more money.*"

Although the union eventually modified and reduced its wage demands, with the exception of its short-lived proposal on May 7 (for a three year contract with annual increments of 26¢ and 26¢, 29¢ and 29¢, and 54¢), the union persisted in demanding a wage increase of the order of magnitude originally demanded and a one-year contract. After reducing its wage demands to 90 cents/one-year June 18 and to 80 cents/one-year on August 27, the union's final proposal, made on October 18, was 80 cents-per-year over a two-year contract. The company consistently insisted on a two-year contract, and increased its 15¢/10¢/15¢/10¢ prestrike offer only once, on May 7, to 20¢/15¢/21¢/15¢.

Thus, it is fair to say that the parties never got close to agreement on the wage issue, and that the two sides' proposals were not even in the same ballpark. The union's final annual raise demand was 2.3 times the company's final annual offer, and that is only when the six month increments are aggregated. There is no indication whatsoever that the union would have settled for anything like the one-shot 25 cent increase granted to the nonstrikers. Nor is there any evidence that but for the April 12 wage increase the union would have lowered its demands or that the strike otherwise would have been settled sooner. Rather, the record taken as a whole supports the conclusion that what caused and prolonged this protracted strike was the company's lawful adherence to a relatively low wage offer and the union's lawful adherence to a relatively high wage demand. As discussed below, § 8(d) of the Act, 29 U.S.C. § 158(d), explicitly states that the duty to bargain in

the company had "unilaterally consolidated" unit glass replacement work and unilaterally placed into effect new [wage?] zones, and that

good faith "does not compel either party to agree to a proposal or require the making of a concession." "Adamant insistence on a bargaining position . . . is not in itself a refusal to bargain in good faith." *Chevron Oil Co. v. NLRB, supra,* 442 F.2d at 1072.

■ For these reasons we hold that the wage increase did not convert the union's economic strike to an unfair labor practice strike on April 12, 1976. Whether subsequent unlawful conduct by the company might have converted the strike at a later date will be considered below.

## VI.

*Unilateral Action: Reneging, Plant Closings, and Replacement Work Transfer*

The ALJ found that the company violated § 8(a)(5) and (1) of the Act by:

■ reneging on its agreement with the Union concerning the three wage zone clause, [2] by unilaterally closing its Lewiston-Waterville operations without fully revealing and discussing all the effects of the closure on the employees, and [3] by unilaterally and permanently assigning bargaining unit work to [SGR] without advance notice and bargaining with the Union prior to the time this change was placed in effect.

The ALJ found that each of these actions was "related" and was part of Charles Soule's overall plan to restructure the Soule companies' operations. We consider each of these findings sequentially.

### A. *"Reneging" on Bargaining Commitments*

■ In appropriate circumstances, a party's "reneging on commitments already made in ongoing negotiations" may be held to violate § 8(a)(5). R. Gorman, *supra,* at 408. As Professor Gorman explains,

If, for example, a tentative agreement is reached on a number of bargaining items, a refusal to honor that agreement at a later date *without good reason* may be

the strike was "caused or prolonged by the above-named unfair labor practices."

viewed as an indicator of bad faith. Thus, if the employer . . . repudiates understandings already arrived at, abruptly changes its positions without any announced reason, or interposes new demands not raised earlier, this conduct will destroy not only amicability at the bargaining table but also the premises on which bargaining had progressed, and will protract the negotiations and delay settlement.

*Id.* (emphasis added). *See, e. g., San Antonio Machine & Supply Corp. v. NLRB*, 363 F.2d 633, 641 (5th Cir. 1966) (significant "reversal of position" on seniority clause "indicative of a lack of good faith").

■ However, "by showing that the earlier negotiations had not clearly resulted in agreement, or that an earlier understanding was intended to be conditioned on the resolution of other disputed issues, or that there were other good reasons to modify one's bargaining position" a party may negate a finding of bad faith bargaining. R. Gorman, *supra*, at 409. *See Food Service Co.*, 202 NLRB 790, 803 (1973). *Cf. NLRB v. Randle-Eastern Ambulance Service, Inc.*, 584 F.2d 720, 726 (5th Cir. 1978) (context of shifting balance of bargaining strength justified company's withdrawal of previously agreed-to proposals; Board's § 8(a)(5) finding reversed); *NLRB v. Tomco Communications, Inc.*, 567 F.2d 871, 883 (9th Cir. 1978) (distinguishing "offers" from concessions; "Absent abuse not present here, it is perfectly legitimate for a party to retract a proposal before the other side has accepted it.").

■ Both on due process grounds and because it is not supported by substantial evidence, we reverse the ALJ's finding that the company's alleged "reneging" vio-

lated § 8(a)(5). First of all, there was no such charge in the amended complaint.[17] The reason for this omission becomes clear upon a careful examination of certain exhibits in the record. In a charge filed on June 8, 1976, the union alleged that the company had engaged in an unlawful "course of conduct, including but not limited to its announcement of a change of position with respect to items previously agreed on." The Regional Director refused to issue a complaint on this charge. By letter of February 23, 1977, in affirming the Regional Director's refusal to issue a complaint on this charge, the Board's General Counsel stated, "absent bad faith, *which we do not find here*, an Employer, following a strike, may lawfully repudiate previously-made bargaining concessions" (emphasis added). Secondly, there was testimony by negotiators for both the company and the union, not discredited, contradicted, or even mentioned by the ALJ, that the parties were negotiating subject to a mutual initial understanding that all agreements on noneconomic issues were tentative until a final agreement had been reached on all issues. Finally, a withdrawal of a previous agreement is indicative of bad faith bargaining only where such action is arbitrary and not supported by a reasonable justification. Here, the company's change of position with respect to the number of wage zones was based on its plan, also announced at the May 6 negotiating session, to close SGG's Lewiston and Waterville warehouses for economic reasons, leaving only two bases of operations (Portland and Bangor) for SGG. Thus, it cannot be said that the company modified its position "without good reason."[18]

---

17. The only potentially relevant allegation in the complaint, paragraph 19(a), involves "unilaterally combining certain work zones." However, this cannot fairly be read to give notice of a charge of reneging on an agreement concerning the number of wage zones.

18. Nor do we find that attorney Levenson's distribution at the August 6 meeting of an "agenda" of topics for discussion, which were either new or proposed modifications on sub-

jects of previous tentative agreement, of itself violated § 8(a)(5) and (1) of the Act. Although the ALJ made no explicit finding on this subject, he implies that this action also was somehow indicative of bad faith. For the above reasons, and in recognition of the significant changes in circumstances occurring over four months of a strike, we cannot sustain this finding.

## B. *Unilateral Action Generally*

■ In general, an employer's "unilateral action" with respect to mandatory subjects of collective bargaining under a collective bargaining agreement is considered an unlawful refusal to bargain. "[A]n employer's unilateral change in conditions of employment under negotiation is . . . a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal." *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962) (unilateral changes regarding automatic wage increases, sick leave benefits, and merit pay increases during contract negotiations). Perhaps the leading case on unilateral action is *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), which held that a company's "contracting out" of all plant maintenance work previously done by bargaining unit employees, without bargaining, violated § 8(a)(5), where unit employees were replaced by those of an independent contractor doing the same work. The Court reasoned that since the Company's decision "did not alter [its] basic operation, . . . to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business," 379 U.S. at 213, 85 S.Ct. at 404; and that national labor policy required "that the union be afforded an opportunity to meet management's legitimate complaints that its maintenance was unduly costly." *Id.* at 214, 85 S.Ct. at 405.

In *NLRB v. W.R. Grace & Co.*, 571 F.2d 279, 282 (5th Cir. 1978), the court stated: It is well-settled that an employer violates its duty to bargain collectively when it institutes changes in employment conditions without first consulting the union . . . . [However,] [t]he employer's power to alter working conditions in his plant is *not* contingent upon union agreement with his proposed change. The company has only to notify the union before effecting the change so as to give the union a meaningful chance to offer counter-proposals and counter-arguments.

(emphasis added; citations omitted) In *Grace*, which involved the company's decision to discontinue a product for economic reasons, with layoffs and elimination of a shift, the court held: "The failure to notify or refusal to bargain with the union over the effects of management decisions to limit production or otherwise alter operations violates Section 8(a)(5) and (1) of the Act." *Id.* at 283.

■ Good faith bargaining requires timely notice and a meaningful opportunity to bargain regarding the employer's proposed changes in working conditions, since " '[n]o genuine bargaining . . . can be conducted where [the] decision has already been made and implemented.' " *International Ladies Garment Workers Union v. NLRB*, 463 F.2d 907, 919 (D.C.Cir.1972). Thus, "[n]otice of a *fait accompli*," regarding a matter as to which the employer is obligated to bargain to impasse, violates § 8(a)(5). *Id.; see Metromedia, Inc., KMBC–TV v. NLRB*, 586 F.2d 1182, 1189 (8th Cir. 1978).

■ As is clear from the above discussion, in some contexts an employer's "unilateral" action ordinarily will *not* violate § 8(a)(5). These situations include unilateral actions where: (1) they relate to matters outside the mandatory bargaining subjects, such as the wages of non-unit, non-union employees, *Allied Chemical Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 171–78, 92 S.Ct. 383, 393–397, 30 L.Ed.2d 341 (1971) (collective bargaining obligation under § 8(d) extends only to "terms and conditions of employment" of employees in appropriate bargaining unit); (2) the employer has bargained in good faith to impasse on the issue, *e. g., NLRB v. U.S. Sonics Corp.*, 312 F.2d 610, 615 (1st Cir. 1963); (3) the changes merely preserve the "dynamic status quo," consistently with past policies and practices, *see* R. Gorman, *supra*, at 450–54; (4) the union has made a "clear and unmistakable waiver" of its right to bargain on the issue, *e. g., Metromedia, supra*, 586 F.2d at 1189; R. Gorman, *supra*, at 466–69; and (5) the actions concern certain major business decisions in-

volving fundamental changes in the scope, nature, or mode of operation of the business, or the commitment of investment capital, *see Machinists and Aerospace Workers v. Northeast Airlines, Inc.,* 473 F.2d 549, 557 (1st Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972) (no duty to bargain regarding merger); *Textile Workers Union v. Darlington Mfg. Co.,* 380 U.S. 263, 268–69, 85 S.Ct. 994, 998–999, 13 L.Ed.2d 827 (1965) (closing entire business not unfair labor practice; "some employer decisions are so peculiarly matters of management prerogative that they would never constitute violations of § 8(a)(1)"). *See generally* R. Gorman, *supra,* at 443–45. The applicability of these exceptions is discussed below.

### C. *The Warehouse Closing*

■■■■ As quoted above, the ALJ found that the company violated § 8(a)(5) and (1) "by unilaterally closing its Lewiston-Waterville operations without fully revealing and discussing all the effects of this closure on the employees." The ALJ found, in support of this conclusion, that by the May 6, 1976 bargaining session, "[t]he Respondent had already decided to close its Lewiston-Waterville facility and work the crews from their homes," and that at the May 6 session the company "presented the Union with a *fait accompli,* Lewiston-Waterville was closing, and the crews were going to work out of their homes." With regard to bargaining on the subject, the ALJ found that

> [a]lthough it then "discussed" with the Union some of the effects of the closing . . . on the employees, there was no meaningful bargaining since Respondent had unilaterally decided upon the effects as well. Furthermore, Respondent did not discuss all of those effects, which included its planned (SGR) operations.

Thus, the Respondent unilaterally changed important working conditions of its bargaining unit employees at Lewiston-Waterville without advance notice and bargaining about all of the important effects of this decision on its employees.

A subcategory of the law of "unilateral actions" involves the special problem of plant closings. As summarized by Professor Gorman,

> [R]egardless of whether the employer is obligated to bargain about such major *decisions* as going out of business, closing down one of several plants, or subcontracting work currently done by its employees, it must bargain about the *effects or impact* of those decisions, such as severance pay or transfer to other company jobs or locations.

R. Gorman, *supra,* at 499 (emphasis added). Thus, there is an important distinction between the duty to bargain about a particular business *decision* affecting unit employees and the duty to bargain about the decision's *effects* on the unit employees; a distinction which at times is difficult to draw. In this case, however, it is only bargaining with respect to the decision's *effects,* not the underlying decision,[19] that is at issue.

In a number of cases involving business changes such as the termination of a particular product line or the closing of one of several plants, courts have held that the employer is required to give the union notice and the opportunity to bargain with respect to the effects of the decision on unit employees before implementing the change. *E. g., NLRB v. W.R. Grace & Co., supra,* 571 F.2d 279 (product discontinuation, with layoffs and shift changes); *International Union, UAW v. NLRB,* 470 F.2d 422 (D.C. Cir.1972) (sale of factory-owned truck deal-

---

**19.** The Board did not hold that the company violated the Act by failing to bargain with respect to its decision to close the SGG Lewiston and Waterville warehouses. It is undisputed that this business decision was based on economic considerations of unprofitability and the need to reduce overhead, and that unit jobs were *not* to be eliminated. There is nothing in the record to suggest antiunion motivation. Apparently the unlawful *fait accompli* found by the Board was therefore not the announcement of the final *decision* to close Lewiston-Waterville (which we may assume, without deciding, that the company had the right to do), but rather the fact that before the announcement the company "had unilaterally decided upon the effects as well," precluding any meaningful bargaining as to the treatment of the affected unit employees.

ership with terminations of all employees; no violation where company official discussed and attempted to mitigate effects with union on and after date of transfer); *Ladies Garment Workers v. NLRB, supra,* 463 F.2d 907 (plant relocation; under circumstances notice and bargaining regarding both decision and effects required); *NLRB v. Acme Industrial Products, Inc.,* 439 F.2d 40 (6th Cir. 1971) (relocation of part of manufacturing operations from old to new plant for economic reasons; no violations where "employer stands ready to negotiate with the Union in respect to any and all (effects) of its move"); *Weltronic Co. v. NLRB,* 419 F.2d 1120 (6th Cir. 1969) (transfer of electronic assembly work from union to nonunion plant, with no layoffs), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 (1970). Nevertheless, as this court observed in *Northeast Airlines, supra* "[t]o allow the Union to force a company to bargain about the effects of its management decisions to the extent of forcing it to forego the proposed change in operations would be in effect to take away from it the freedom to make the decision in the first place." 473 F.2d at 558.

A threshold issue is whether petitioners had sufficient notice that the plant closing was in issue, and whether this issue was "fully litigated" so as to comport with due process. As noted above, there is no mention of the Lewiston-Waterville plant closing as an § 8(a)(5) violation in the amended complaint.[20] However, in this instance we hold that the plant closing issue was fully and fairly litigated. Several witnesses were questioned by both counsel as to the reasons for, and timing, announcement, implementation, permanency, and bargaining table discussion of the Lewiston-Waterville closing. There is no merit to the company's argument that due process was not afforded with respect to this issue.

The above-quoted passages from the ALJ's opinion, p. 1085 *supra,* make clear that the § 8(a)(5) violation found was a matter of degree rather than a *per se* refusal to bargain. There is no finding that the company completely failed or refused to discuss the effects of the closing decision upon the affected employees. Indeed there appears to be no dispute that the subject of the treatment of the employees was discussed by both sides at some length at the May 6 and 7 sessions (including discussions of combining seniority lists, superseniority, and travel pay), and that no agreement was ever reached on the subject.[21] What the ALJ found was that the company announced the closing "without *fully* revealing and discussing *all* the effects of this closure on the employees," and that although the company " 'discussed' with the Union *some* of the effects" after the announcement, "there was no *meaningful* bargaining" since the company had already "unilaterally decided upon the effects as well" (emphasis added). Among the "effects" omitted from discussion by the company was "its planned [SGR] operations." [22]

---

20. The only potentially relevant allegations are: "unilaterally combining certain work zones," ¶ 19(a), and unilaterally reassigning bargaining unit work to nonunit employees, ¶ 19(d). Although arguably related, these allegations cannot fairly be said to give notice of a refusal-to-bargain issue regarding a plant closing.

21. Of particular note is the credited testimony of union negotiator Walter Dolbow concerning the May 6 meeting of the parties:

> DOLBOW: The company announced that they had closed the plants in Lewiston and Waterville and that they now wanted to go to two [wage] zones and they informed us that then *we would have to negotiate what to do with the employees.*
>
> . . . . .

> ATTY. LEVENSON: Was there any discussion about any of the employees right then and there?
> DOLBOW: Right then and there, yes, sir, there was.

(Emphasis added.) Attorney Levenson later testified to the same effect:

> At the May 6th meeting, I indicated that the Company wanted to close the Lewiston and the Waterville warehouses. *And then I wanted to discuss, and asked to discuss the effects of that closing. I had these three proposal . . .*

(Emphasis added.)

22. The ALJ elaborated on the relationship he saw between the plant closing and the advent of SGR thus: "Respondent had already decided [as of May 6] to close the Lewiston-Waterville

Thus, the sense of the Board's finding seems to be that the company merely went through the motions of bargaining regarding the effects of the Lewiston-Waterville closing while in fact having made up its corporate mind what it would do with the affected employees—in essence a finding of "surface bargaining." It is not the company's refusal to bargain regarding effects, but rather its state of mind while ostensibly doing so—subjective bad faith—that apparently was found to be an unfair labor practice.

■ Our careful examination of the record discloses no support for the ALJ's inference of bad faith bargaining with respect to the Lewiston-Waterville plant closings. The company manifestly offered to discuss the effects of this operational change on unit employees, offered three proposals on the subject, and bargaining in fact did occur. The fact that no agreement was ever reached is indicative, in this context, not of the company's refusal to bargain in good faith on the issue, but of bona fide bargaining to impasse. The union was given "a meaningful chance to offer counter-proposals and counter-arguments" to the company's "effects" proposals. *NLRB v. W. R. Grace & Co., supra*, 571 F.2d at 282. That is all the Act requires. We find no evidence that the company merely "engag[ed] the union in sham discussion," *Ladies Garment Workers, supra*, 463 F.2d at 917.

An argument of somewhat more substance is that the company implemented the plant closing decision before it had bargained to impasse with the union on the effects issue—that when announced the closing decision, its implementation, and its effects on employees were already accomplished. The testimony of the various company witnesses establishes that the closing *decision* was made and became final in early May, prior to May 6; was announced to Kenwood Kimball, the SGG Lewiston branch manager, during the first week in May by SGG president Edward Churchill; and that the actual closing took place between May 12 and May 15. In the interim the lengthy May 6 and May 7 bargaining sessions were held, with no agreement as to the treatment of the Lewiston and Waterville crews. Thereafter, the union adhered to the position that the company could not close the warehouses, and at the next session on May 25 took the position that everything was settled except wages. Although the ALJ discredited testimony that union negotiator Holcroft stated at the close of negotiations on May 7 that the parties were at an impasse, one could reasonably conclude that an impasse had been reached at least as to the closing/effects issue.

■ In any event, irrespective of the precise dates of impasse and implementation of the *closings*, it is clear that the company could not have implemented its proposed *effects* of the closings—*i. e.*, having the men report to jobs directly from their homes—until June 1976 or later, because at the time of all these events SGG had no active employees. All were on strike, and no replacements were hired for the Lewiston-Waterville operation until late May.[23] Hence, it is somewhat illusory to talk of the effects of the plant closing upon members of the bargaining unit, who while on strike were not concretely affected at all. Under these circumstances, where the

---

facility and work the crews from their homes, in order to set the stage for the day when [SGR] would become fully operational and would be in a position to take over SGG's replacement work.

We cannot sustain the ALJ's conclusory assertion of the relationship between the plant closing and the creation of SGR. The two have no necessary logical or functional relationship, and each was justified by the company, in undisputed testimony, as serving distinct business purposes. Since we find no substantial evidence in the record of any such relationship

(except perhaps a rough temporal coincidence and an allegation by the union that SGR commenced operations at SGG's former Lewiston location), we conclude that SGR was not an undisclosed *effect* of the Lewiston-Waterville closing. Whether nondisclosure and failure to bargain regarding SGR was in independent violation we consider *infra*.

23. The first Lewiston replacement, Daniel Moreau, began work on May 24, 1976. The other three Lewiston replacements started in mid-June or later.

company did offer to bargain in good faith about the effects of the operational change upon bargaining unit employees before any changes were actually implemented, we hold that no violation of § 8(a)(5) or (1) occurred.

### D. Diversion of Bargaining Unit Work

The ALJ found that the company also violated § 8(a)(5) and (1) "by unilaterally and permanently assigning bargaining unit [glass] replacement work to [SGR] ...." In support of this conclusion the ALJ found that

> the corporate reorganization and its effect on the bargaining unit remained concealed until completed and sprung upon the Union's negotiators also as a *fait accompli* at the August 6 bargaining session. It was then the Union learned for the first time ... that these changes were in force and that all of SGG's bargaining unit replacement work had been permanently lost to the nonunion [SGR].

 It is clear that "[t]he preservation or diversion of unit work" constitutes a "term [or] condition of employment" subject to mandatory bargaining under § 8(d) of the Act. *NLRB v. Rockwell-Standard Corp.*, 410 F.2d 953, 957 (6th Cir. 1969). The employer must bargain with respect to the *decision* to remove work from bargaining unit employees, not merely its effects on the employees. The leading case is *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 209, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964), which held that the employer is required to bargain about "contracting out" work previously performed by members of the bargaining unit. As discussed above, the *Fibreboard* Court reasoned that where the operational change would merely reassign work done by existing employees to others (an independent contractor) who would "do the same work under similar conditions of employment," it would not unduly impair management pre-

rogative to require bargaining, and that national labor relations policy required that the union be given an opportunity to negotiate a mutually acceptable alternative. *Id.* at 213–14, 85 S.Ct. at 404–405. In *American Cyanamid Co. v. NLRB*, 592 F.2d 356 (7th Cir. 1979), the court applied *Fibreboard* to hold that the employer's decision, during a strike, permanently to contract out maintenance and service work, terminating half of the bargaining unit employees, violated § 8(a)(5) and (1) and converted the strike. The court distinguished permanent contracting out, where bargaining is required, from *temporary* contracting out "to enable the employer to continue operating in an emergency situation thrust upon it by a strike," where it has been held that bargaining was not required. *Id.* at 360. *See Puerto Rico Telephone Co. v. NLRB*, 359 F.2d 983, 987 (1st Cir. 1966) (need not bargain about subcontracting "to meet some temporary or transient need, ... unless the subcontracting adversely affects the unit's present employees").

The record makes clear that some significant portion (but not all) of the "outside" glass replacement work formerly done exclusively by SGG employees was assigned to the newly-created, nonunion SGR "replacement centers" at some point during the strike, as part of Charles Soule's corporate reorganization plan, and that at some point this transfer became "permanent." Charles Soule testified that he began to set up "replacement centers" consolidating the former King & Dexter and SOAGCO divisions of SGI in late April, 1976; that "technically ... from an accounting standpoint" SGR did not begin to exist "until June of '76"; and that SGR signs first appeared in July or August. Walter Dolbow testified that he first became aware of SGR in mid-May, 1976 when "the signs first started being noticed by the strikers." [24] Kenwood Kimball, SGG's Lewiston manager, testified

---

24. We note that in its first set of unfair labor practices charged, filed on June 8, 1976, the union charged, *inter alia*, that "the company continues to do business at its Lewiston location under the changed name of Soule Glass Replacement"; and that the union's June 27 charge included the allegation that the company had "unilaterally consolidated glass replacement work formerly performed by bargaining unit employees."

that in mid-May the SGG supervisors stopped doing emergency replacement work, which was taken over by SGR, that SGG started doing exclusively contract work at this time, and that the reason for the transfer was that due to the strike SGG had no men to do the replacement work. Several witnesses testified that once permanent replacements were hired, SGG resumed doing some outside replacement work, but less than before the strike. Charles Soule testified, somewhat equivocally, that the decision to transfer SGG glass replacement work to SGR is and was a permanent decision, and was made in June or July of 1976. The existence of SGR and the company's intention to transfer permanently to SGR SGG's replacement work was first disclosed to the union at the August 6 bargaining session, when attorney Levenson presented an "agenda" including these and other "proposals." The union reacted with what the ALJ characterized as a "stunned" silence.

■ The issue is whether the company had made a *permanent* transfer of some portion of SGG's outside glass replacement work to SGR before August 6, with the result that Levenson's purported "proposals" were really the announcement of a *fait accompli*. The company argues, *inter alia*, that the change was not made permanent until some unspecified later date, and that until that time the changes were a temporary response to the exigencies of the strike. The ALJ found otherwise. On this issue the ALJ is on much firmer ground. Substantial evidence supports his inference that the company had already made and implemented its decision by August 6.

One indication that the shift of replacement work effectively became permanent prior to August 6 is that only a portion of the replacement work was shifted back to SGG when the hiring of striker replacements during June and July eased SGG's strike-caused labor shortage. Also, apart from the metaphysical question of when a change becomes "permanent," there is no evidence that Charles Soule ever intended that his reorganization plan and concomi-

tant new division of labor be instituted on a trial basis, or merely as a temporary response to the strike. Neither the fact that SGG (striker replacement) employees resumed or continued doing *some* replacement work nor the fact that there was no ultimate decline in the SGG workforce vitiates the conclusion that substantial work was diverted from the bargaining unit.

■ The ALJ's findings, amply supported by the record, thus compel the conclusion that the company failed to give the union notice of its intended action with respect to SGR "sufficiently in advance of actual implementation . . . to allow reasonable scope for bargaining," *Ladies Garment Workers v. NLRB, supra*, 463 F.2d at 919. Such unilateral action, without prior bargaining to impasse, violates § 8(a)(5). The company's argument that the union waived bargaining on this issue, either by its silence on August 6 or by virtue of the contractual management rights clause, is without merit. We therefore affirm the ALJ's finding that the diversion of bargaining unit work to SGR, without prior disclosure or bargaining, violated § 8(a)(5) and (1) of the Act.

■ In light of the ALJ's finding that the strike was "prolonged by the [company's] unfair labor practices both at and away from the bargaining table" subsequent to April 12, it becomes necessary to consider whether the record supports the inference that the company's failure to bargain regarding the transfer of replacement work to SGR converted the strike. We find no evidence that the company's actions with respect to SGR aggravated, changed the focus of, or in any way prolonged the strike. To the extent that the ALJ found to the contrary, such a finding was necessarily based on impermissible speculation and surmise. The only pertinent testimony as to the union's reaction is Walter Dolbow's exaggerated statement that, based on the SGR "proposal" in the August 6 agenda, "they've taken about 90 percent of the work that we did and gave it away. And if we had bought this proposal, we would have been out of work." By contrast, SGG offi-

cers Edward Churchill and Andrew Soule testified that before the strike replacement work constituted only ten percent of SGG's workload, and Andrew Soule estimated that it would be about four percent in 1977, a decline attributable in part to the strike, corporate priorities, and a declining overall trend in glazing sales. All that the record shows is that the SGR "proposal" was unacceptable to the union, that the union made little or no immediate response to Levenson's August 6 presentation, and that in the union's eyes wages continued to be the critical issue at subsequent negotiations. Evidence of prolongation and causation is wholly lacking. Thus, we hold that the record does not support the inference that the company's SGR unfair labor practice converted the strike.

## VII.

### Supervisor Strike Misconduct

The Board found that the actions of SGG president Edward Churchill and SGG Hampden branch manager Edward Tribou on June 25, 1976 violated § 8(a)(1) of the Act. The ALJ found that the supervisors' unlawful conduct included Tribou's throwing picket signs into the street at SGG's Bangor and Hampden facilities, Tribou's and Churchill's solicitation of strikers Carleton French and Harold Douglas, to return to work with promises of increased wages, Churchill's assault on striker Nick Botzko at the Hampden site, and Tribou's threats and attempts to incite a fight at both locations. The ALJ noted that prior to these incidents Churchill and Tribou had "had drinks and lunch at a nearby restaurant." He also found that Nadeau responded to Tribou's threats and taunts that the strikers "were getting to them and that the company officials had been working 7 days a week, 12 to 14 hours a day." In so finding, the ALJ credited the testimony of pickets French, Douglas, and Nadeau, and discredited the accounts of the incidents of Churchill and Tribou, except to the extent that the latter corroborated the strikers' testimony. The ALJ further found that French, Douglas, and Nadeau "reported the respective inci-

dents which they observed in detail to the assembled union membership at the monthly membership meeting a day or two later."

It is clear that a supervisor's physical violence or threats of assault against employees engaged in protected conduct, attributable to the supervisor's employer under agency principles, violates § 8(a)(1). *NLRB v. Fry Foods, Inc.,* 241 NLRB No. 42 (1979), enf'd, 609 F.2d 267 (6th Cir. 1979) (per curiam) (threats of violence to union supporters, assault by automobile); *NLRB v. Gibbs Corp.,* 297 F.2d 649 (5th Cir. 1962) (beating of union organizers); *NLRB v. H. R. McBride,* 274 F.2d 124 (10th Cir. 1960) (nonunion company president's violence against union pickets held to coerce nonunion employees); *Heights Thrift-Way, Inc.,* 155 NLRB 52 (1965) (nonunion company president's threats and violence against peaceful union pickets); R. Gorman, *supra,* at 326. Similarly, soliciting striking employees individually and offering financial inducements to return to work has been held to violate § 8(a)(1). *E. g., NLRB v. Easton Packing Co.,* 416 F.2d 256, 258 (3d Cir. 1969); *NLRB v. Neiderman,* 334 F.2d 601, 603 (2d Cir. 1964). Such overtly anti-union conduct, likely to intimidate or undermine employees' free exercise of their § 7 rights, is typically held to be a *per se* violation of § 8(a)(1). Under the objective test, the "ineffectiveness of the supervisors' activities ... will not vitiate a Section 8(a)(1) finding if the conduct itself, viewed in context, may reasonably induce fear of reprisal or anticipation of reward." *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1115 (7th Cir. 1973).

Under basic § 8(a)(1) objective test principles, however, it is possible that under limited circumstances such objectionable employer conduct might be found to be *de minimis.* As discussed *supra,* the appropriate inquiry is whether, under the circumstances, reasonable union pickets would feel "interfere[d] with, restrain[ed] or coerce[d]" in the exercise of their statutorily protected rights by the incident in question. *Cf. Associated Grocers of New England Inc. v. NLRB,* 562 F.2d 1333, 1335–36 (1st Cir.

1977) (dismissing certain *striker* picket line misconduct as "slight," within allowable "leeway for impulsive behavior," noting objective test is "whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act"); *Peerless, supra*, 484 F.2d at 1115, 1120 (record shows employees "resolute and unintimidated," supervisor threats and solicitations ineffective, "marginal indiscretions," but § 8(a)(1) finding affirmed as having "reasonable basis in law").

 Although the objective impact of Churchill's and Tribou's misconduct is questionable, we affirm the Board's finding of § 8(a)(1) violations as "having a reasonable basis in law." *Peerless, supra.* We find no basis for disturbing the ALJ's reasoned credibility determinations, and the record supports his findings as to the factual details of the two incidents. Strike violence and attempts to subvert or circumvent the bargaining process cannot be condoned. We conclude, however, that viewed in context these were clearly isolated violations of the Act and must be treated as such for remedial purposes. The supervisors' misconduct consisted of two incidents occurring on one Friday afternoon of a long strike. There is no evidence whatsoever that the supervisors' actions were part of any larger scheme by the company to intimidate the strikers or had any relationship to the company's conduct at the bargaining table.[25] More likely, the supervisors' irrational (and

inexcusable) behavior resulted from a combination of too much to drink,[26] overwork, and frustration caused by the protracted strike and its effect on the business. Not only were the assault and solicitation predictably ineffective in intimidating or enticing the strikers, but they were apparently counterproductive, strengthening the strikers' resolve by showing they were finally "getting to" the company. *Cf. Peerless, supra*, 484 F.2d at 1120. Walter Dolbow testified that the report of the incidents at the union meeting "sort of pulled everybody together at that time. We had almost started to fall apart at that time and the actions of the company did more to unite us than I could have ever done with a big speech." Dolbow said the members "were pretty angry" and reaffirmed that "we would continue to strike to the end."

 Since the ALJ found that the strike was converted to an unfair labor practice strike on April 12, he made no explicit finding as to whether the supervisor misconduct itself would have converted the strike.[27] We hold that the record would not support such a finding. The only relevant testimony is that of Dolbow, just quoted. Apart from our doubts whether Dolbow's conclusory characterizations of the union's collective reaction would if taken at face value support the inference that these incidents prolonged the strike, we agree with petitioners that the incidents' effect on the union was "the exact opposite of what the conversion theory is supposed to prove." As discussed above, pp. 1079–

---

**25.** The following passage from *Peerless, supra*, aptly characterizes the situation here: "It is difficult to comprehend how the sturdy and sophisticated American working man would be brought to the point of abandoning his pro-union voting intentions by incidents like these .... What clearly emerges is a picture of employees with enough hardiness and confidence in their Union and their rights as not to be cowed by these marginal indiscretions." 484 F.2d at 1120.

**26.** There is substantial evidence to support the conclusion that Churchill and Tribou were under the influence of alcohol, if not fully intoxicated, at the time of the incidents. Both testified that they had had several drinks with lunch at the Pilot's Grill, Bangor. Nadeau and

Douglas testified that the supervisors had apparently been drinking, and that one or both had "swizzle sticks" in their pockets, but that Churchill and Tribou were not "drunk."

**27.** The ALJ did find that the strike "was *thereafter prolonged* by the Respondent's unfair labor practices both at and *away from* the bargaining table (emphasis added). Since the supervisor misconduct was the only subsequent unfair labor practice, besides the diversion of work to SGR, *supra*, occurring away from the bargaining table, it could be reasonably inferred that the ALJ found that the supervisor misconduct prolonged (and thereby would independently have converted) the strike.

1080 *supra,* the rationale of the conversion doctrine is that the strike is "expanded to include a protest over [the] unfair labor practice," *NLRB v. Top Manufacturing Co., supra,* 594 F.2d at 225, and that the strikers remain on strike longer than they otherwise would have *"in protest* against employer conduct which is found . . . to be in violation of the Labor Act." R. Gorman, *supra,* at 339 (emphasis added). Here, by contrast, the evidence showed that the employer's marginal violation of the Act *encouraged* the strikers to maintain the strike (although there is no basis for concluding that they otherwise would not have) because the supervisors' irrational behavior convinced them that, in Dolbow's words, "we're getting to them when they have to resort to this stuff with our pickets." In other words, the supervisors' impotent acts of frustration gave the strikers new hope that their strike was succeeding. Section 8(a)(1) declares to be an unfair labor practice employer conduct which "interfere[s] with, restrain[s], or coerce[s] employees" in the exercise of their § 7 rights, not conduct which encourages, strengthens, or aids protected conduct. Therefore, the supervisor strike misconduct violations at most support the issuance of a cease-and-desist order.

### VIII.

*Refusal to Provide Requested Information*

The ALJ held that petitioners violated § 8(a)(5) and (1) of the Act "by failing and refusing to promptly furnish the Union with adequate relevant information concerning wages necessary to the performance of the Union's functions as collective-bargaining agent during negotiations." The ALJ found that the information requested by the union at the November 22,

1976 bargaining session was requested "in order to justify the Company's wage position," was relevant to the negotiations on "the crucial unresolved issue . . . [of] wages," that the relevance of the requested data was increased by reports that nonstriking employees and replacements had received raises, and that in this context the company's reason for declining to furnish more detailed information—fears for the safety of the replacements in light of alleged union strike misconduct—was inadequate. Finally, the ALJ found that the company's furnishing of additional information, pursuant to settlement agreement, on March 18, 1977, was "too late to be meaningful or legally significant." The ALJ did not distinguish in his findings between the information requested regarding bargaining unit (SGG) employees and non-unit (SGI and SGR) employees.

#### A. *The Legal Standards*

 The general rule is that an employer must supply, on request, "relevant information" "in the employer's possession" "needed by a labor union for the proper performance of its duties as the employees' bargaining representative," *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979); *i. e.,* "to enable the [union] to understand and intelligently discuss the issues raised in bargaining . . . ." *San Diego Newspaper Guild v. NLRB,* 548 F.2d 863, 866 (9th Cir. 1977). *See* R. Gorman, *supra,* at 409. Absent special circumstances, *see Western Massachusetts Electric Co. v. NLRB,* 589 F.2d 42, 47 (1st Cir. 1978), "relevance" is determinative of the duty to disclose.[28] Relevance is to be determined by a liberal "discovery-type standard." *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 437, 87 S.Ct. 565, 568, 17

---

**28.** In *Puerto Rico Telephone Co. v. NLRB,* 359 F.2d 983, 986 (1st Cir. 1966), we held that "an employer violates Section 8(a)(5) and (1) of the Act by refusing during the term of a collective bargaining agreement, to furnish information requested by the union if such information is *relevant* to a grievance, or to the administration or policing of the agreement," (emphasis in original), and, quoting *Curtiss Wright Corp. v. NLRB,* 347 F.2d 61, 69 (3rd Cir. 1965), we declared that an employer's refusal to honor

such a request is a "per se violation of the Act." In *Puerto Rico Telephone,* however, we did not focus on any claim of privilege. We do not consider that decision inconsistent with the position we take here, that under certain circumstances the duty to disclose relevant information may be qualified. *Cf. Emeryville Research Center v. NLRB,* 441 F.2d 880, 886–87 (9th Cir. 1971)—(per se language in *Puerto Rico Telephone* and other cases "gratuitous" dicta; holdings "considerably narrower").

L.Ed.2d 495 (1967). As the Supreme Court noted in the leading case of *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 153–54, 76 S.Ct. 753, 756–757, 100 L.Ed. 1027 (1956), "[e]ach case must turn on its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met."

 Where the requested information concerns wages and related information for employees in the bargaining unit, the information is presumptively relevant to bargainable issues." *NLRB v. Rockwell-Standard Corp.*, 410 F.2d 953, 957 (6th Cir. 1969). Unless the employer comes forward with an effective rebuttal as to lack of relevance or "provide[s] adequate reasons why he cannot, in good faith, supply the information," *NLRB v. Borden, Inc.*, 600 F.2d 313, 317 (1st Cir. 1979), the union need make no showing of relevance. *Curtiss-Wright Corp. v. NLRB*, 347 F.2d 61, 69 (3d Cir. 1965). *See Boston Herald-Traveler Corp. v. NLRB*, 223 F.2d 58, 63 (1st Cir. 1955) (disclosure required "without regard to its immediate relationship to the negotiation or administration of the collective bargaining agreement"). Furthermore, the company is obligated to make a "reasonably diligent effort" to obtain such relevant information, and absent some valid justification must provide all of the relevant data requested. *Borden, supra*, at 318.

 "[W]here the request is for information concerning employees *outside* the bargaining unit, the Union must show that the requested information is relevant to bargainable issues." *Rockwell-Standard, supra*, 410 F.2d at 957 (emphasis added). Information in the latter category also includes profits, production figures, wage surveys of competitors and other information that "is not ordinarily pertinent to [the Union's] performance as a bargaining representative, but is alleged to have become so because of peculiar circumstances." *San Diego Newspaper Guild*, 548 F.2d at 867.[29] To meet its burden regarding such information, the Union must show more than "an abstract, potential relevance" or "mere suspicion or surmise." *Id.* at 868. It must show, "by reference to the circumstances of the case . . . more precisely the relevance of the data it desires." *Curtiss-Wright, supra*, 347 F.2d at 69.[30]

 However, where the employer, during bargaining, puts in issue information not presumptively relevant, the employer must produce data to substantiate its

29. Cases requiring disclosure of nonunit employee data include *NLRB v. Brazos Electric Power Coop.*, 615 F.2d 1100, 1101 (5th Cir. 1980) (nonunit employee wage data, where company had maintained "a degree of wage parity between non-unit and unit employees of similar skills," to prepare for upcoming negotiations); *Western Mass. Electric Co. v. NLRB*, 573 F.2d 101, 107–08 (1st Cir. 1978) (first case) (costs of subcontracting work capable of being done by unit members, where employer claimed use of union employees uneconomical); *NLRB v. Rockwell-Standard Corp.*, 410 F.2d 953, 957 (6th Cir. 1969) (names, job classifications and descriptions for nonunit employees assigned to new facility, where erosion of bargaining unit through work transfer was at issue); *NLRB v. Goodyear Aerospace Corp.*, 388 F.2d 673, 674 (6th Cir. 1968) (per curiam) (job titles, descriptions, wages, benefits, etc. for nonunit R & D employees, where company assignment of employees in dispute; Board summarily affirmed); *Curtiss-Wright Corp. v. NLRB*, 347 F.2d 61, 69 (3d Cir. 1965) (job titles, classifications, descriptions, duties, and pay scales for nonunit "confidential and administra-

tive" employees where shrinkage of unit and misclassification of employees were at issue).

30. Cases upholding the employer's refusal to disclose nonunit information include *NLRB v. Temple-Eastex, Inc.*, 579 F.2d 932, 936–37 (5th Cir. 1978) (nonunit employee identity, job classification, wage, and benefit data; no showing of relevance to union grievance or otherwise, plus lack of timely notice of theory of relevance); *Western Mass. Electric, supra*, 573 F.2d at 108–10 (second case) (costs of subcontracting work not of concern to union, where diversion of unit work not an issue); *NLRB v. Western Electric, Inc.*, 559 F.2d 1131, 1134 (8th Cir. 1977) (names, grades, wages, ratings, seniority status of nonunit employees who *might* be transferred to unit; no showing of need or relevance to bargainable issues); *San Diego Newspaper Guild v. NLRB*, 548 F.2d 863, 868 (9th Cir. 1977) (identity and compensation of contractor's employees being trained as contingency striker replacements, where union failed to show probable contract violation or other relevance).

claims. As the Court stated in *Truitt Manufacturing, supra,* "[g]ood-faith bargaining necessarily requires that claims made by either bargainer should be honest claims . . . . If such an argument [inability to afford wage increases] is important enough to present, in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." 351 U.S. at 152–53, 76 S.Ct. at 755–756. In *Teleprompter Corp. v. NLRB,* 570 F.2d 4, 9 (1st Cir. 1977), this court held, "[w]hen the employer itself puts profitability in contention—as by asserting an inability to pay an increase in wages—information to substantiate the employer's position has to be disclosed." We further stated that "[t]he employer may not limit the relevant information disclosed to just those fragments which satisfy its own view of the issue," and rejected a mootness argument against enforcement of the Board's order. *Id.* at 11. *See Western Massachusetts Electric Co. v. NLRB,* 573 F.2d 101, 106–07 (1st Cir. 1978) (where company cited economics as reason for using subcontractor rather than unit employees, company put subcontractor costs in contention and must substantiate its cost assertions).

 Under certain narrow circumstances, an employer may be excused from providing requested information presumed or shown to be relevant. When the employer has a good faith claim of undue burden, legitimate business need for confidentiality or justifiable fear of violence or harassment of employees, disclosure generally will not be required. *Western Massachusetts Electric Co.,* 589 F.2d at 47. R. Gorman, *supra,* at 415–18. In such cases, the court will weigh the competing interests of the employer and the union in the requested information, and the type and extent of disclosure required will depend on "the circumstances of the particular case." *Detroit Edison, supra,* 440 U.S. at 314–15, 99 S.Ct. at 1130–1131 (refusing to require unconditional disclosure to union of employee psychological aptitude test where employer had reasonable confidentiality concern). For example, a union is not entitled to even clearly relevant information "in the precise form demanded," where this would entail undue burden. *Emeryville Research Center v. NLRB,* 441 F.2d 880, 887 (9th Cir. 1971).

 In *Emeryville,* the union requested salary grade curves, individual salaries, and merit ratings for 430 *unit* professional employees to enable the union "to bargain intelligently." The court held that

> [W]here, as here, the Company raises *bona fide* objections [*i. e.,* burdensomeness and confidentiality of competitors' salary data] to the form in which information is requested and offers to provide information sufficient to meet the Union's needs in a mutually satisfactory form, the Union must do more than rely on general avowals of relevance in order to establish its right to the information. It must state the uses to which the information is to be put so that the company is afforded an opportunity to provide it on mutually satisfactory terms . . . . Once the Union has done so, a Company refusal to provide information adequate to meet the Union's needs within a reasonable time would support an unfair labor practice charge . . . .

441 F.2d at 885. The court held that "resort to the Board is premature" where company has offered to accommodate the union's needs and the union refused to cooperate in the above manner. *Id.* at 886; *see Shell Oil Co. v. NLRB,* 457 F.2d 615, 619–20 (9th Cir. 1972) (citing *Emeryville, supra*). In addition, "[t]he employer may also defend against disclosure by demonstrating that there is a clear and present danger that the union will use the information to incite violence or harassment of employees." R. Gorman, *supra,* at 416. The leading case regarding this defense is *Shell Oil Co. v. NLRB, supra,* in which following a violence-marred strike the union requested the names and addresses of all unit employees (40% of whom were not union members). The company expressed fears of misuse of the list for harassment of employees, proposed alternatives to the requested mode of disclosure, and offered to work toward a "mutually agreeable" compromise, while

the union could give no assurance that the list would be kept confidential. The *Shell* court, finding a "likelihood of a clear and present danger" to the employees involved, sustained the company's refusal to disclose under the circumstances: "Presentation of *bona fide* concerns by the Company, coupled with reasonable proposals designed to satisfy the needs of the Union and to achieve a mutually satisfactory resolution of the Union request, is simply not a refusal to bargain." 457 F.2d at 620.[31] Another leading case is *Sign & Pictorial Union v. NLRB*, 419 F.2d 726 (D.C.Cir.1969), where during a strike the union requested payroll records to verify allegations that strikebreakers were getting higher wages and bonuses than had union members. The company declined to turn over the records, in the context of harassment, threats and assaults to strikebreakers, "without some assurance that the information was necessary and . . . would not be used " 'to further facilitate harassment of replacements.' " *Id.* at 730. The court upheld the Board's finding of no violation by the company. *But see NLRB v. Pearl Bookbinding Co.*, 517 F.2d 1108, 1113 (1st Cir. 1975) (where, after strike, union requested current employees' names, addresses and classifications, and company had *no* good faith fear of harassment or violence, disclosure required).[32]

■ In general, then, the "clear and present danger" defense is likely to be sustained where the company articulates a reasonable good faith fear of harm to striker replacements, offers to explore alternative forms of disclosure acceptable to both parties, and the union refuses to consider any such alternatives. However, in any information request case where the company's objections are frivolous, made for the purpose of delay, or part of an overall context of bad faith bargaining, the Board and

courts are properly unsympathetic. *See Pearl Bookbinding, supra,* 517 F.2d at 1113–14; *Emeryville, supra,* 441 F.2d at 886; *NLRB v. Fitzgerald Mills Corp.,* 313 F.2d 260, 264–65 (2d Cir.), *cert. denied,* 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963).

**B. The Request and the Company's Response**

By letter of November 23, 1976, attorney Cohen described the information requested at the previous day's bargaining session as follows. For "all auto glass workers, inside glass workers, helpers and glaziers" of SGI, SGG, SGR, and Presque Isle Glass d/b/a Soule Glass and Glazing:

(1) the employee's name, (2) classification, job description, title or the like, (3) his or her hourly wage and average number of hours worked weekly as of February 21, 1976 and April 22, 1976, (4) any change in hourly wage or average number of hours worked weekly at any time since April 12, 1976 specifying the date(s) of such change(s), the amount(s) of change(s) in hourly wage and/or average hours worked weekly, and (5) any changes since April 12, 1976 in any and all benefits specifying all particulars of and relating to such changes.

As to the reason for the request and the relevance of the requested information, the letter stated:

The purpose of this information request and the need for such information is to permit the Union to bargain intelligently with the Company as to wages and benefits and, with respect to same, to understand, evaluate and discuss with the Company at . . . further negotiations its wage and benefit position as explained by you at yesterday's negotiating session.

Attorney Levenson delivered the company's written response at the bargaining ses-

---

**31.** The court in *Shell,* noting that "the Company has behaved in a reasonable and conciliatory manner throughout, while the Union has been demanding, arrogant and intransigent," said it would be "most anomalous" to hold that the company rather than the union had refused to bargain. 457 F.2d at 618.

**32.** In *Pearl Bookbinding,* this court also rejected the company's argument that its eventual release of the requested data made the information disclosure issue moot, since the company did not concede the illegality of its past conduct and "present compliance [does not] deprive this court of the power to decide the disputed issues." 517 F.2d at 1114.

sion on December 9. Levenson's letter first recounted that the information requested was "prompted" by his statement that SGG during the strike had been able to hire better men for less money and that, from a strictly economic point of view . . ., it did not make sense to pay more than our last offer when, in fact, we had found that it was possible to acquire a better labor force for even less than the current rate . . . in regard to spirit and productivity if not necessarily glazing expertise.

As noted above, the company on December 9 furnished two lists: a weekly listing of the aggregate overtime hours worked by nonsupervisory SGG employees and the number of men working each week, without any names; and another list, without names, of the then-current wage rates of SGG employees, numbered one through thirty-four. In addition, Levenson's December 9 letter stated that during the strike the company had not classified any new employees, except as "strike replacements," and had made no changes in benefits.

Levenson's letter characterized this disclosure as "a preliminary step" which "at this stage of the proceedings . . . should be sufficient for you to bargain intelligently," and offered to submit the employees' names and substantiating material to a third party for verification. Levenson gave the following reasons for the company's refusal to provide further requested information: (1) the company's doubts as to the union's motivation for making the request at the sixteenth bargaining session, eight months into the strike, given the numerous unfair labor practice charges the union had filed against the company, and the company's desire to avoid giving the union "ammunition for indeed another unfair labor charge"; (2) the company's "great obligation to protect the new men hired from coercive conduct and harassing tactics such as the union agreed not to further continue in its posting notice in case number 1–CB–3412;" (3) the hour information requested would require an individual analysis for each employee and "involve a great deal of difficulty in time and effort in preparing such a list"; and (4) regarding non-SGG employees "we do not understand that the law requires any disclosure of information concerning these companies . . .," since the SGI employees had voted to decertify the union prior to the strike.

The record contains no evidence of any response by the union, at the final bargaining session on December 9 or otherwise. Attorney Cohen did not testify. On December 17, 1976, the union filed an unfair labor practice charge alleging the company's "failure and refusal" to supply sufficient requested information.

The validity of the ALJ's conclusions with respect to the information disclosure issue, in this factual context, presents a close and complex question. The company's positions regarding the bargaining unit and non-unit information require separate analysis, and the ALJ's failure to distinguish legally and factually between these distinct types of information complicates our task.

## C. Bargaining Unit Wage and Hour Information

■ The law is clear that the wage, hour, and benefit information requested regarding bargaining unit SGG employees (including the striker replacements, given that the bargaining unit is defined by jobs, not people, see note 8 supra) is presumptively relevant and must be disclosed on request, *Rockwell Standard, supra,* unless the company advanced a sufficient, good faith reason why full disclosure could not be made in the form or manner requested. *San Diego Newspaper Guild, supra; Borden, supra.*

The company offered two potentially adequate justifications for its limited disclosure: (1) with regard to the omission of names, its fear of harassment of the striker replacements if their identities were known; and (2) with regard to the incompleteness of the wage and hour data, the burdensomeness of producing weekly hours-worked data for each employee.

■ The record shows that the company's fear of harassment of replacements by strikers was a reasonable and *bona fide*

one, in light of previous events during the strike.[33] There was, not surprisingly, considerable animosity between the two groups. One replacement, Raymond Irish, was assaulted, unprovoked, in a bar by union president David Bates. Others were threatened by picketing strikers on several occasions or followed home. Replacements' car windows were broken and their tires slashed. In another instance, a striker attempted to run off the road a company truck driven by a replacement. On other occasions vandalism was directed against the company, with several glass and window smashing incidents reported. Under these circumstances, it could reasonably be found that there was a "clear and present danger" that union members would use the replacements' names to facilitate further harassment. *Shell, supra.* The union offered no assurances that the names would not be misused. Moreover, other than for verification purposes, the union's need for the replacements' names is not obvious. The company's offer of third party verification satisfies this concern and is indicative of the company's good faith concern regarding employee harassment. *Compare Pearl Bookbinding, supra.* The union's failure to pursue the matter except by filing unfair labor practice charges substantially weakens its position. *Cf. Emeryville, supra.* We hold that withholding employee names under these circumstances did not violate § 8(a)(5) or (1).

■ However, the company's justifiable failure to disclose employee names makes even more unjustifiable its unexplained failure to provide the requested job descriptions corresponding to the wage rates it furnished. In the absence of job descrip-

tions, the union could not substantiate its allegation that the SGG striker replacements had received the 25 cent-per-hour wage increase granted to SGI employees, a fact which the company had never admitted during the negotiations, and which was proved by the company's subsequent wage and hour disclosure pursuant to settlement agreement. The wage increases were also concealed by the company's unjustified failure to respond to the union's request for the amount(s) and date(s) of any change in hourly wages.[34] Nor could the union verify on the basis of the information it received whether or not the company was in fact getting its work done for "less money" than union employees had been paid, or whether the replacements were indeed more productive. The company's statement that the new employees had not been "classified" except as "strike replacements" is at best unresponsive. The relevant question, to which the union was entitled to a prompt answer, is replacements for *which* strikers, in terms of job description. In these respects, the company's response was legally insufficient and violated § 8(a)(5) and (1).

■ The sufficiency of the SGG wage and hour information provided presents a different, closer question. Again, such information is presumptively relevant, and was made more so by both the union's allegation that SGG replacements had received the disputed wage increase and the company's "better men for less money" claim. However, there is no evidence that the company's partial disclosure was designed to frustrate the union's bargaining effort or was merely a delaying tactic. The union asked for several types of detailed wage and hour data, and asked that the company

33. That the company had a good faith concern about the safety of the replacements is substantiated by the following passage in a January 27, 1977 letter from Levenson to the Board's regional office (in which the company offered to disclose replacements' names and other information in settlement of the information charge):

I would like to emphasize, however, that I am very much concerned that the disclosure of the names will result in harassment to the newly hired men. . . . I would very much

appreciate some sort of assurance by the union to you that there will be no retaliatory harassment against these men.

34. The testimony of various striker replacements shows that they not only started at a wage 25¢/hour higher than had previously been paid to (union) employees starting at the same job and skill level, but that some subsequently had received an additional 25¢/hour raise.

supply it within a period, exclusive of weekends and the Thanksgiving holiday, of less than two weeks. The company supplied some of what was requested, describing that disclosure as "a preliminary step," stated that compiling the detailed hour information requested would be burdensome and time-consuming, and suggested an approximate method by which the average weekly hours per man could be calculated. The company did *not* refuse to provide further wage and hour data or contest the union's right to the data concerning SGG employees. The clear implication was that the company was willing to supply the same at a later date, given time to prepare it, if the initial disclosure did not satisfy the union's needs. There is nothing in the record either to support or rebut the company's assertion of burdensomeness. At this point we merely note, taking into account the extent of the data involved,[35] that this claim is not facially frivolous, and we find nothing either in the company's remarkably candid letter of December 9 or elsewhere to suggest that it was not made in good faith.

■■■ "A union's bare assertion that it needs information ... does not automatically oblige the employer to supply all the information in the manner requested." *Detroit Edison, supra,* 440 U.S. at 314, 99 S.Ct. at 1130. The union is not necessarily entitled to the information "in the precise form demanded." *Emeryville, supra,* 441 F.2d at 887. When the employer presents a legitimate, good faith objection on grounds of burdensomeness or otherwise, and offers to cooperate with the union in reaching a mutually acceptable accommodation, it is incumbent on the union to attempt to reach some type of compromise with the employer

as to the form, extent, or timing of disclosure. In these circumstances, immediate "resort to the Board is premature." *Emeryville, supra.* To be sure, the union need not indulge the company in protracted negotiations over the terms, content, and form of disclosure. *Id.* at 885. *Cf. Borden, supra,* 600 F.2d at 318 ("a company may not play dog-in-the-manger just to put the Union through the hoops"). Nor, however, can the union instantly put the company to the election of either immediately supplying everything demanded or having to defend yet another unfair labor practice charge. Good faith is required on *both* sides.

■■■ Here, the record contains no evidence that the union made any effort whatsoever to pursue the information request with the company, but immediately filed unfair labor practice charges (which were ultimately settled when the company agreed to disclose the additional SGG wage and hour data, *inter alia,* on March, 1977). This all-or-nothing approach casts doubt on the union's good faith need or desire for the information,[36] and made a "federal case" out of a minor dispute which manifestly should and could have been informally resolved without invoking the Board's burdensome remedial mechanism.

■■■ We hold, following *Emeryville* and *Shell, supra,* that "where, as here, the Company raises *bona fide* objections to the *form* in which information is requested" and indicates its willingness "to provide information sufficient to meet the Union's needs in a mutually satisfactory form," the Union must afford the company an opportunity to provide the data on mutually satisfactory terms. *Emeryville,* 441 F.2d at 885. Once the union has done so, but not

---

**35.** One indication of the extent and detail of the requested wage and hour information is the handwritten data sheets supplied, covering 46 employees, pursuant to Board-approved settlement agreement on March 18, 1977, which sheets appear in the record as exhibits.

**36.** The urgency of the union's need for the information is even more questionable in light of the timing of the request. Despite the fact that wages had been the crucial issue from the outset, that replacements had been hired start-

ing in June, 1976, that Levenson had praised the work of the replacements as early as the August 6 session and explicitly made the "better men for less money" claim on October 22, the union made no request for wage and hour information until the end of the 16th bargaining session, over seven months into the strike. Yet when the company failed to respond to its satisfaction within two weeks, the union one week later filed its fourth of nine sets of unfair labor practice charges against the company.

before, the company's "refusal to provide adequately to meet the Union's needs within a reasonable time would support an unfair labor practice charge." *Id.* It is only where such problems cannot be worked out, after some further minimal effort at the bargaining table, that the problem is properly presented to the Board and courts. Thus, we find no violation with respect to the SGG wage and hour information, and need not consider the relevancy and sufficiency of the subsequent disclosure of such information on March 8, 1977.

### D. *Non-unit Wage and Hour Information*

The non-unit information regarding SGI and SGR employees presents a different question. With respect to such non-bargaining unit information, the Union must demonstrate the relevance, under the circumstances, of the requested information to bargainable issues in the case. *Rockwell-Standard, supra; Curtiss-Wright, supra.* When the union fails to advance reasons why the information is relevant or necessary to its performance as bargaining representative (and where the company does not itself put such information in issue), it is not for the Board or courts to supply potential justifications. Moreover, the union's theory of relevance must be reasonably specific; "general avowals of relevance" such as "to bargain intelligently" and similar boilerplate are insufficient. *Cf. Emeryville, supra.* However, where the relevance of the requested non-unit information is obvious in the context of the negotiations, the company cannot resist disclosure simply because the union has failed to make a formal presentation of its theory of relevance.

As to the information requested for SGI employees, the company plainly had no obligation to disclose such information to the union. The company in its December 9 letter explicitly declined to make disclosure "unless [the union] can demonstrate either a legal precedent or a rational motivation

for [the] information." The union made no effort to do so, and was not entitled to the SGI information.

However, the opposite result is required with respect to the information regarding the SGR employees. We held, in part VII, *supra,* that substantial evidence supports the Board's determination that bargaining unit glass replacement work was removed from SGG and given to SGR, and that the company's failure to disclose and bargain with respect to this action violated the Act. Thus, the erosion or diversion of bargaining unit work to SGR was clearly an issue in the case, having been made so by the company's covert reorganization and its presentation in Levenson's August 6 "agenda." *Compare Rockwell-Standard, supra* (disclosure required where erosion of unit work at issue) *with Western Mass. Electric, supra* (disclosure not required where diversion of unit work not at issue). *See* notes 29–30 *supra.* Furthermore, the company assigned returned striker Roland Ray to SGR early in the strike and concealed this fact from the union. In this context, where the company's own actions and bargaining "proposals" regarding SGR made the amount and type of work of SGR employees an issue of singular relevance to the union, the union was not obligated to demonstrate further the relevance of such information. The union's stated concern at the November 22 meeting was the wages and hours of "those employees the [company] had hired after the strike to do bargaining unit work," which at least potentially included some employees of SGR. The job descriptions, hours, and wages of SGR employees would have enabled the union to estimate the amount of SGG outside glass replacement work being done by SGR.[37] Although a more specifically-framed request might have gotten at such information more directly (*e. g.,* "the percentage of outside glass replacement work done by SGR, in terms of hours worked, by week") and would have made

---

**37.** Indeed, the wage and hour data furnished pursuant to settlement on March 18, 1977 listed a category of "other (non-SGG) employees doing some replacement work," pursuant to the term of the settlement agreement requiring disclosure of requested information "pertaining to all employees performing bargaining unit work."

the union's need and theory of relevance clearer to the company, in light of the company's unlawful conduct with respect to SGR we think these omissions do not vitiate the union's right to the requested information. Thus, we affirm the ALJ's holding that the company's refusal to supply such information violated § 8(a)(5) and (1), and agree that the March 18 disclosure, to the extent it pertained to SGR (which is ambiguous), was too late to be of legal or practical significance.

 However, the union's complete failure to respond to the company's explicit invitation to articulate its theory of relevance has a bearing on appropriate remedial measures.[38] Also, we note the absence of any evidence that the company's failure promptly to provide all the information to which the union was legally entitled in any way contributed to prolonging the strike. To the extent the ALJ's conversion finding can be interpreted as finding to the contrary, we hold that it is not supported by substantial evidence.

## IX.

### Course-of-Conduct and Overall Bad Faith Bargaining

 The ALJ held that the company "engag[ed] in a course of conduct beginning April 12, 1976 designed to disparage the Union's leadership, undermine its effectiveness as bargaining agent during the negotiations, and destroy its majority," in violation of § 8(a)(5) and (1) of the Act. The ALJ stated that "this course of action was highlighted by specific incidents of bad faith which have been discussed in detail," reasoning as follows:

This conclusion is supported not only by the specific unfair labor practices which I have found to have occurred in the negotiations themselves, but also by the unlawful conduct of Respondent's supervisors away from the bargaining table.

These acts served to highlight a pattern of conduct in which the Union was placed in a position of constantly having to reduce its wage proposals while the Respondent made no movement at all, and constantly renegotiate, at times in the dark, items which had already been agreed to. Some of these items, as discussed herein, involved major corporate changes with adverse effects to bargaining unit employees. The Respondent argues that only economics and its corporate survival dictated its actions, and that the changes it made were simply for the purpose of getting the work done, but these important factors give the Respondent no right to run rough shod over the bargaining rights of its employees. Moreover, all this occurred in an atmosphere where the Union was constantly being chided with remarks about how well the strike replacements were getting along in their jobs and that the Company had found better men for less pay. In sum, Respondent's total conduct placed the Union in a position which no self respecting representative would tolerate. I find that such conduct at the bargaining table amounts to a total rejection of the principles expressed in Section 8(d).

We reverse the Board's course of conduct finding, holding that it is inconsistent with the requirements of due process, is not supported by substantial evidence, and is based on erroneous legal reasoning.

### A. Due Process

 The ALJ acknowledges that a course-of-conduct or overall bad faith bargaining violation "is not specifically alleged in the complaint." Nor, we add, was anything similar alleged, "specifically" or generally. Nevertheless, the ALJ found that during the lengthy hearing "the totality of the Respondent's conduct during the 1976 negotiations was fully litigated," and that the course of conduct issue "is implicit in

---

**38.** We note that the company, in declining to disclose the SGR information, was acting in reliance on a legal theory that, but for its actions with respect to SGR, would have been valid—*i. e.*, that the burden is ordinarily on the union to show the relevance of nonunit information. Our holding is merely that under the circumstances disclosure is required, not that the company's failure to disclose was in bad faith.

the arguments made in the General Counsel's brief." First of all, even if such an argument appeared explicitly in the General Counsel's post-hearing brief, such post-hoc characterizations of the case would not be relevant in determining whether the employer had notice of the issue and a meaningful opportunity to defend· against it *at the hearing*. It is revealing that the company's detailed 80-page post-hearing brief—which left no stone unturned in arguing the facts and law regarding both the allegations in the complaint and additional points stressed at the hearing—devotes no attention to the purported course of conduct issue, except to state on its penultimate page:

> Much has been said in this brief about the contents of this record. However, it is also important to point out what is missing. There is nowhere present the large tinge of discrimination that most of these type cases have had and there is no bad faith bargaining.

Thus, if the employer had notice of the course-of-conduct issue, it was both unduly subtle and untimely.

 Second, our painstaking review of the 1308 page record leaves us firmly convinced that (a) the company made clear that it was not litigating overall bad faith bargaining, and (b) the "totality" of the company's conduct at the bargaining table was not fully litigated in the sense relevant to a course-of-conduct violation. In his opening statement, company attorney Levenson noted that the union's several charges of bad faith bargaining had been refused by the Board's Regional Director and again by the Appeals Section, and that no such charge appeared in the amended complaint. Levenson then stated,

... I would conduct the case a lot differently if I had a charge of bargaining in bad faith, which I don't have .... Now the point I'm making is although I'm here to defend against what the complaint, and the amendment to the complaint, and the amendments to the amendments say, I'm not here defending the charges of bargaining in bad faith because that isn't before us with regard to the bargaining session[s].

Although there was some discussion on the point, neither the General Counsel nor the ALJ asserted the contrary.[39]

 Much later in the hearing, another revealing colloquy took place:

> MR. DiCIERO (for the General Counsel): I thought Mr. Levenson, at the beginning of this hearing, said that he didn't think [sic] that we had dismissed the case with regard to a course of conduct 8(a)(5), and so therefore he wanted to make sure that we were not going to have to go through each bargaining session piece by piece.
>
> And now he brought in attorney Mayo Levenson to testify as to certain bargaining sessions. And now Mr. Levenson is talking about this issue to sustain various issues which I'm not aware of with regard to the wages at the bargaining table. I don't know what he's talking about.
>
> JUDGE DENISON (ALJ): ... I want to litigate the issues in the complaint. That's all I want to litigate .... We'll take the negotiations when they come up if they come up ....

These excerpts from the record indicate that during the hearing both the parties and the ALJ were operating under the premise that neither the company's course

**39.** Levenson's statement was apparently prompted by the following remarks in the General Counsel's opening statement: "Respondent ... embarked on a course of conduct which essentially converted the strike from an economic strike to an unfair labor practice strike"; and "... I think your Honor will have to evaluate [the purported negotiations regarding the effects of the transfer of work to SGR] as to whether there were actual negotiations or were ... undertaken in what was essentially an atmosphere of bad faith." However, the reference to the company's "course of conduct," in context, is reasonably interpretable as simply a convenient means of referring to the aggregate of the alleged discrete violations, which were enumerated immediately thereafter, rather than as alleging an independent violation of the Act.

of conduct, nor overall bad faith bargaining, were being tried, independently, implicitly, or otherwise. The record does not support the contention that the company had notice of this issue and an opportunity to meet it, or that the issue was in any sense "fully and fairly litigated" as due process requires. *See NLRB v. H.E. Fletcher Co., supra,* 298 F.2d at 600; *Boyle's Famous Corned Beef Co. v. NLRB, supra,* 400 F.2d at 162; *J.C. Penney Co. v. NLRB, supra,* 384 F.2d at 483. Had the company known that its entire course of conduct or overall good faith was in issue, it is likely, as Levenson stated, that it would have litigated the case "a lot differently," *see Drug Package, Inc. v. NLRB, supra,* 570 F.2d at 1345; in particular by presenting detailed evidence of the conduct of the parties at each of the 17 bargaining sessions. Especially in a case as complex as this one, "[s]imply because violations could have been alleged in addition to those in the complaint does not obligate the employer to defend against all possibilities." *NLRB v. Pepsi Cola Bottling Co. of Topeka, supra,* 613 F.2d at 274. Here, the ALJ improperly assumed the prosecutorial role, deciding an issue which he alone belatedly injected into the case. *NLRB v. Tamper, Inc., supra,* 522 F.2d at 789–90. We refuse to enforce a finding so at odds with fundamental fairness.

 At oral argument, the Board suggested that the company's failure to request post-hearing reopening of the record to receive additional evidence on the course of conduct issue foreclosed it from now arguing that this issue was not fairly litigated.[40] This contention is without merit. The company amply preserved its appellate rights on the issue in its exceptions to the ALJ's decision timely filed on August 27, 1979, in which it strenuously objected to the ALJ's course-of-conduct finding on both procedural due process and substantive grounds.[41] It would impose an unfair and intolerable burden on a party to require the further step of attempting to reopen the evidence to litigate new matters not in issue at the hearing. Requiring the company to come forward after trial to rebut a violation neither charged, litigated nor proved by the General Counsel is to stand the adversary process on its head. Moreover, as a practical matter, reopening the record on the course-of-conduct issue here would likely require extensive testimony as to each of the 17 bargaining sessions, necessitating the recall of witnesses who had appeared at the original hearing; a wasteful and burdensome procedure that is without justification.

### B. *The Merits*

 Although the above holding disposes of the issue, we note that even if due process had been satisfied, we would nevertheless be compelled to reverse the course-of-conduct finding for want of substantial evidence, and because the ALJ's analysis is apparently based on faulty legal premises. The precise basis of the ALJ's substantive holding is unclear, but he apparently relied on (a) the various specific unfair labor practices found, and (b) the company's alleged unreasonable, unyielding, or antiunion positions and conduct at the bargaining table. We treat these sequentially.

---

**40.** On October 16, 1979, the company filed a post-hearing motion to reopen the evidence in order to offer a further letter from the union, dated October 4, 1979, reiterating the union's demand for "reinstatement of all of the men as a group," which motion the union and General Counsel opposed. The Board in a footnote to its order affirming the ALJ denied the motion to reopen on grounds of irrelevance. The company's (unsuccessful) attempt to supplement the record on one issue does not make its failure to do the same on other issues a waiver of its objections on such other issues.

**41.** Section 10(e) of the Act, 29 U.S.C. § 160(e), provides in pertinent part that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Here, petitioners' exceptions were plainly "urged before the Board" and summarily rejected. Section 10(e) also empowers the court to order that additional evidence be taken before the Board where the movant shows ". . . that there were reasonable grounds for the failure to adduce such evidence in the hearing . . . ." No such motion is before the court.

Of the numerous violations found by the ALJ, we have sustained only four— the wage increase, supervisor misconduct, failure to bargain regarding SGR, and nondisclosure of certain information. Each of these violations either presented close questions or had insubstantial practical consequences; even in combination they were insufficient to convert the nature of the strike. Each was essentially an isolated event, separate in time from the others in the context of a long and bitter strike marred by unfortunate incidents of misconduct on both sides. As this court has noted, "[i]ndividual acts or statements of a negotiating party which appear contrary to the required attitude cannot be drawn upon to dilute a finding of good faith where the totality of the party's conduct conforms to the dictates of the statute." *NLRB v. Almeida Bus Lines, Inc.,* 333 F.2d 729, 731 (1st Cir. 1964). Unless a "course-of-conduct violation" means nothing more than the sum of several discrete violations, and thereby has no independent significance, further evidence of bad faith is required.[42]

The ALJ found that the company's course of conduct was "designed to disparage, . . . undermine, . . . and destroy . . ." the union. Thus, he found that the company was guilty of antiunion animus and implies that there was an overall company scheme, plan, or conscious pattern of behavior, manifested by the various unfair labor practices and bargaining positions, aimed at destroying the union. However, absent some articulable objective basis in the record, such conclusory assertions about the employer's state of mind cannot be sustained.

Section 8(d) of the Act requires the parties to "confer in good faith" in an effort to reach agreement, but explicitly states that neither agreement nor concessions are required. 29 U.S.C. § 158(d). In what has become a leading case on the subject, this court framed the inquiry regarding good faith bargaining thus:

> [T]he question is whether it is to be inferred from the totality of the employer's conduct that he went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement if possible, or that it bargained in good faith but was unable to arrive at an acceptable agreement with the union.

*NLRB v. Reed & Prince Mfg. Co.,* 205 F.2d 131, 134 (1st Cir.), *cert. denied,* 346 U.S. 887, 74 S.Ct. 139, 93 L.Ed. 391 (1953). Since the intent to frustrate agreement or to undermine the union are rarely articulated for obvious reasons, bad faith is typically inferred from the unreasonableness of the employer's substantive positions at the bargaining table. *Id.* at 135; R. Gorman, *supra,* at 481. Thus, adamant employer adherence to proposals predictably unacceptable to the union, refusal to make meaningful concessions, and unprincipled insistence on substantive positions unreasonable under the circumstances may justify a finding of bad faith bargaining. *See* R. Gorman, *supra,* at 485–95. However, hard bargaining and the use of a company's relative economic strength to exert pressure on the union "is of itself not at all inconsistent with the duty of bargaining in good faith." *NLRB v. Insurance Agents' Union,* 361 U.S. 477, 490–91, 80 S.Ct. 419, 428, 4 L.Ed.2d 454 (1960). *See H. K. Porter Co. v. NLRB,* 397 U.S. 99, 109, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970); *South Shore Hospital v. NLRB,* 630 F.2d 40, 44 (1st Cir. 1980); *Chevron Oil Co. v. NLRB,* 442 F.2d 1067, 1073 (5th Cir. 1971). "Adamant insistence on a bargaining position . . . is not in itself a refusal to bargain in good faith." *Id.* at 1072; *see NLRB v. Herman Sausage Co.,* 275 F.2d 229, 231 (5th Cir. 1960). "The right to union representation under the Act does not

---

**42.** The ALJ cited no authority for his course-of-conduct finding. The Board, in its brief, attempts to distinguish the "unlawful course of conduct" found from "bad faith bargaining" or "surface bargaining," but cites no authority either for the distinction or for what a "course-of-conduct" violation entails. The company argues that what was found was a garden variety § 8(a)(5) refusal-to-bargain in good faith, unsupported by either the complaint or the evidence.

imply the right to a better deal. The proper role of the Board is to watch over the process, not guarantee the results." *NLRB v. Tomco Communications, Inc.*, 567 F.2d 871, 877 (9th Cir. 1978).

Our review of the record compels the conclusion that this was simply a case of hard bargaining between an employer and union with a history of contentious, strike-plagued relations. The failure of the parties to reach agreement was due to the adamant, but lawful, adherence by both sides to positions close to their original proposals, especially on the wage issue. The fact that the union made more concessions on the wage issue than the company is itself of little significance.[43] As another court has noted in a similar context where the lack of company concessions on wages was alleged as evidence of overall bad faith bargaining, "[t]he Company was not obliged to increase its wage offer merely because the Union lowered its demand, particularly where the Union's reduced demand still amounted to a very substantial increase." *Sign & Pictorial Union v. NLRB*, 419 F.2d 726, 739 (D.C.Cir.1969). As Levenson stated, as the strike wore on the company's economic position apparently improved, strengthening its bargaining position and making it less rational or necessary to make further concessions. The company's eventual hiring of a full complement of replacements and its satisfaction with their performance further reduced its incentive to concede. This is in no way inconsistent with the Act. Where the union cannot by the use of the substantial economic weapons protected by the Act convince the employer to agree to terms acceptable to its members, the Board may not intervene to "equalize or neutralize pressures in the name of lack of good faith," *M. R. & R. Trucking Co. v. NLRB*, 434 F.2d 689, 695 (5th Cir. 1970), or to compel the employer to grant the union a better or 'fairer" deal than the union was itself able to obtain. *See Tomco Communications, supra.*

The record shows that this simply was not the case of egregious employer behavior and flagrant violation of the Act which the ALJ's strong and indignant rhetoric attempts to convey. This case does not fit the procrustean bed of classic bad faith bargaining cases such as *Reed & Prince, supra* (evidence of overall bad faith included employer's delay of initial bargaining session, refusal to allow union to post routine notices to its members, unjustified delay in providing requested information, adamant refusal to consider key terms without a principled reason, and presenting an egregiously deficient and one-sided "proposed contract") or *Alba-Waldensian, Inc.*, 167 NLRB 695 (1967) (adamant insistence on maintaining existing wages and company's right to cut wages unilaterally, absolute refusal to consider checkoff of union dues or arbitration clause, refusal or delay in supplying wage data, insistence on a no-strike clause, refusal to adopt a formal grievance procedure, and wage and benefit increases to employees in nonunion plants).[44] *See* note 11 *supra.*

Another factor which militates against the ALJ's course-of-conduct finding and supports our conclusion that the issue was not fairly litigated is the relatively cursory evidence in the record as to the details of each bargaining session—the positions, proposals, statements, allegations, responses, and actions of the parties crucial to support inferences of good or bad faith.[45] Virtually

---

**43.** Although we are aware of the mischievous uses to which such statistics can be put, we note that one view of the wage negotiations is that the company increased its annual wage offer by 40 percent (from an aggregate 25¢ to 35¢ per hour), while the union reduced its annual wage demand by only 27 percent (from $1.10 to 80¢ per hour).

**44.** Although he does not cite *Reed & Prince* or *Alba-Waldensian* in connection with the course-of-conduct violation, the ALJ's conclu-

sion that "the company's conduct placed the union in a position which no self respecting representative would tolerate" is nearly identical to the language used in these cases to support a finding of bad faith bargaining. *See* 205 F.2d at 139; 167 NLRB at 696, 697.

**45.** In *Reed & Prince, supra*, this court affirmed the Board's finding of refusal to bargain in good faith only "[a]fter an attentive review of *the entire record of the bargaining negotiations.*" 205 F.2d at 135.

no evidence was produced and nothing appears in the ALJ's decision as to the first four (pre-strike) of the 17 bargaining sessions. Although the April 9, May 6, May 7, August 6 and October 22 sessions are summarized in moderate detail, six of the remaining sessions (i. e., May 25, June 18, August 27, October 18, November 22, and December 9) are relegated to brief, two or three sentence descriptions, typically devoted mostly to the parties' positions on the wage issue; and the ALJ notes that regarding the September 14 and 15 meetings "[t]here is almost no evidence." By contrast, in *Alba-Waldensian*, the Trial Examiner's decision on which the Board's opinion was based included a painstakingly *detailed* review of *all* 22 negotiating sessions; a review which fills 34 double-column, small-print pages in the NLRB Reports.

■■■ For all the above reasons, we reverse the Board's finding that petitioners were guilty of an unlawful course of conduct in violation of § 8(a)(5) and (1).

## X.

### Denial of Immediate Reinstatement

Pursuant to his finding that the company's unfair labor practices had prolonged and converted the strike, the ALJ found that

the ... persons named in paragraph 20 of the complaint for whom the Union unconditionally applied for reinstatement, and to whom the Respondent on March 25, 1977, refused reinstatement, are unfair labor practice strikers, and that by refusing reinstatement to them the Respondent violated Section 8(a)(1) and (3) of the Act.

The basic issue is whether the strike was an "economic" strike or an "unfair labor practice" strike at the time the permanent striker replacements were hired. There is no dispute that the strike began as an economic strike in support of the union's wage and other contract demands. Therefore the question is whether the strike was converted to an unfair labor practice strike by the employer's subsequent conduct, and if so, when.

### A. The Nature of the Strike

■■■ The distinction between economic and unfair labor strikers determines reinstatement rights:

It is settled that an employer may refuse to reinstate economic strikers if in the interim he has taken on permanent replacements. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345–46, [58 S.Ct. 904, 910–911, 82 L.Ed. 1381]. It is equally settled that employees striking in protest of an employer's unfair labor practices are entitled, absent some contractual or statutory provision to the contrary, to unconditional reinstatement, with back pay, "even if replacements for them have been made." *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278 [76 S.Ct. 349, 355, 100 L.Ed. 309].

*NLRB v. International Van Lines*, 409 U.S. 48, 50–51, 93 S.Ct. 74, 76–77, 34 L.Ed.2d 201 (1972). Economic strikers, upon unconditional request, are entitled to reinstatement to their former or substantially equivalent positions unless the employer has "legitimate and substantial business justifications" for denying the request, and having hired permanent replacements is a legally sufficient justification. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378–79, 88 S.Ct. 543, 545–546, 19 L.Ed.2d 614 (1967). However, such economic strikers do have a right to preferential rehiring when the departure of permanent replacements creates vacancies. *Laidlaw Corp. v. NLRB*, 414 F.2d 99 (7th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). *See NLRB v. Crimptex, Inc.*, 517 F.2d 501, 504 (1st Cir. 1975); *American Machinery Corp. v. NLRB*, 424 F.2d 1321, 1328 (5th Cir. 1970).

■■■ We have already held, in part V, *supra*, that the strike was not converted on April 12 by the wage increase. In addition, in light of the ALJ's finding that the strike "was thereafter prolonged by the Respondent's unfair labor practices both at and away from the bargaining table," we have examined the record for evidence bearing on the question whether any of the three

subsequent unfair labor practices which we have sustained might have prolonged and thereby converted the strike at a later date. Our review of the record with respect to the failure to bargain with respect to SGR, the supervisor misconduct, and the failure to disclose all of the required information, as noted in parts VI, VII, and VIII, *supra*, discloses no basis for an inference that any of these violations of the Act had any material effect on the nature, motivation, or length of the strike.

The fundamental stumbling block, from the prestrike negotiations in March 1976 to the reinstatement request in late March, 1977, was wages and to a lesser extent the duration of the agreement. The parties never came close to agreement on the wage issue, and there is no indication that either party's adherence to its economic demands was caused by anything other than "[d]eep conviction, firmly held," that their position was valid under the circumstances. *NLRB v. Herman Sausage Co.,* *supra*, 275 F.2d at 231. Walter Dolbow's television statement in February 1977 that "we [are] on strike for more money" is one indication that it was the union's strong belief that its members were underpaid that kept the strikers on the picket lines for nearly a full year. To be sure, the union was bitterly unhappy with the company's bargaining positions and proposals, as reflected both by heated exchanges at certain bargaining sessions and the union's filing nine unfair labor practice charges over the course of the strike. It would be to disregard the realities of modern-day collective bargaining, however, not to recognize that in some instances an unfair labor practice charge may be more of a bargaining stratagem than a credible indication that the Act has in fact been violated. Moreover, as discussed above, it is simply not the case that whenever in the course of a strike an employer commits an act that is found to constitute an unfair labor practice the strike is thereby transformed into an unfair labor practice strike. Some showing of prolongation and causation is required to support a finding of conversion.

It might be argued that in light of our holding regarding the effect of the wage increase and our reversal of certain unfair labor practice findings, the appropriate course would be for us to remand this case to the Board for a determination whether any of the three surviving unfair labor practices converted the strike. However, for several reasons we conclude that a remand is inappropriate. First, as noted above, we find the record so devoid of any evidence to support a finding of conversion that a remand would likely be pointless. Our holding that the ALJ's finding that the strike was "prolonged [after April 12] by Respondent's unfair labor practices ..." is not supported by substantial evidence disposes of the matter. Second, the parties, the court, and the public have a strong interest in the prompt, accurate, fair and final disposition of labor cases. The events in question took place over four years ago. A remand and the inevitable return to this court for another review would prolong the controversy still longer, without any indication that a more appropriate adjudication would be achieved. Rather, under these circumstances, we agree with the Court of Appeals for the Seventh Circuit that remand "would merely give the Board another bite at the proverbial cherry, and ... piecemeal litigation would result." *NLRB v. Colonial Haven Nursing Home, Inc.,* 542 F.2d 691, 711 (7th Cir. 1976) (on petition for rehearing). Therefore, in the interests of finality, we decline to remand for further findings on the conversion issue and deny enforcement of those portions of the Board's remedial order which depend on the finding of conversion.

## A. Reinstatement Rights of Economic Strikers

Because we hold that the strikers were economic strikers throughout the duration of the strike, we must consider their rights as economic strikers upon the request for reinstatement made on March 25, 1977. Since the ALJ proceeded under the assumption that the strikers were at all relevant times unfair labor practice strikers, he did

not reach this issue. However, because the law is clear on the issue and because the company appears to have acted consistently with the law applicable to economic strikers, we find no need to remand on this issue. *See Colonial Haven, supra*, 542 F.2d at 707–11 (declining in equitable discretion to remand on the same issue under similar circumstances).

 A threshold issue is whether, as the company contends, the reinstatement request was in fact conditional. The company bases this contention on the union's March 8 letter "unconditional[ly]" applying for "immediate reinstatement" of 22 named strikers, including David Bates, and the Union's March 11 letter clarifying that "unconditional reinstatement, as a group" was requested. By letter of March 21, the company informed the union that by reason of Bates' strike misconduct, it was terminating him, and that "Mr. Bates is the only one of the twenty-two that the company takes the position that it will refuse reinstatement because of strike misconduct." [46] The company now argues that the inclusion of Bates, in a "group" request, makes the request conditional. Rejecting this contention, the ALJ explained in a footnote:

> The Respondent has argued that the Union's offer of reinstatement is conditional because the list of strikers' names includes that of David Bates. I find no merit to this contention. At no time did the Union ever state that none of the strikers would return to work unless all of those listed in its March 8 offer were returned. Furthermore, no such implication can be drawn from the Union's letter protesting the Company's desire to conduct individual interviews of the strikers

before deciding whether or not to reinstate them. ·

For substantially the reasons stated, we agree with the ALJ that the request was intended by the union to be, and was as a matter of law, unconditional. "The employer has the burden of showing that the offer to return was not unconditional." *NLRB v. Okla-Inn*, 488 F.2d 498, 505 (10th Cir. 1973). The company has not met that burden. Indeed, in view of the fact that it failed to raise its contention regarding Bates and conditionality during the exchange of correspondence concerning the reinstatement request, the company's argument has more the appearance of a post-hoc rationalization than a serious legal contention.[47] The positions and actions of the parties make clear that the real controversy was not over the conditionality of the reinstatement request, but rather over whether the strikers were economic or unfair labor practice strikers, in light of the differing reinstatement rights afforded those two categories.

We have held above that the strikers were economic strikers at all relevant times. As such, "[t]he strikers ... run the risk that they may be permanently replaced while the strike is underway, and the fact that such replacements are on the job provides an adequate justification for an employer's refusal of reinstatement." *NLRB v. Crimptex, Inc., supra*, 517 F.2d at 504. Here, the union took that risk, and all the SGG strikers were permanently replaced before the reinstatement request. However, under *Fleetwood Trailer* and *Laidlaw, supra*, the strikers have the right to be rehired before others are hired when the

---

**46.** After a detailed review of the evidence, the ALJ found "that the Respondent refused to reinstate David Bates because of serious instances of strike-related misconduct, and therefore the respondent did not violate Section 8(a)(1) and (3) of the Act as to him." This finding is not challenged by the General Counsel.

**47.** *H. & F. Binch Co. v. NLRB*, 456 F.2d 357 (2d Cir. 1972), cited by the company, is distinguishable. *Binch* held to be conditional a request for group reinstatement which was explicitly con-

ditioned on all being reinstated together. *Binch* clearly involved economic strikers, who are not entitled to immediate reinstatement, and the Board there conceded that this fact made the group request conditional. Here, by contrast, the union in good faith took the non-frivolous position that the strikers were unfair labor practice strikers. A union's group reinstatement demand, based on this premise, does not make the request conditional simply because the union's legal theory is eventually held to be incorrect.

departure of their replacements creates vacancies, unless, in the words of § 2(3) of the Act, 29 U.S.C. § 152(3) (defining "employee"), a striker has "obtained . . . other regular and substantially equivalent employment." *See Little Rock Airmotive, Inc. v. NLRB*, 455 F.2d 163 (8th Cir. 1972).

The company, relying on its belief that the strikers were economic strikers, acted consistently with these requirements. It did not refuse reinstatement to any of the strikers except Bates, and his termination was found to be for good cause. With respect to all the other strikers, the company in its final letter to the union on March 25, 1977, stated that "upon proper application, the Company will reinstate those strikers who so desire when openings occur under the dictates of the law . . . for economic strikers . . . ." The record shows, and the ALJ noted, that pursuant to this offer the company reinstated strikers Earl Curtis on March 21, 1977, George Light in July, 1977, and Henry Ward on October 3, 1977.[48] The uncontradicted testimony of company witnesses Edward Tribou and Andrew Soule indicated that when positions opened, SGG recalled those strikers whom they considered the "best men," "irrespective of seniority," whom management believed were not already working elsewhere,[49] and that no other positions had become available.

■ There is no claim before us that the company has reinstated strikers in a discriminatory manner, or that it otherwise employed unlawful criteria in choosing who to reinstate when a position became available or has failed to act in good faith. Nor is there any contention that the company has terminated its reinstatement offer or failed to keep it open for a reasonable time.[50] Therefore we hold that, on the record be-

fore us, petitioners did not violate § 8(a)(3) of the Act by refusing immediate reinstatement to the strikers as a group, and we deny enforcement of the portion of the Board's order that requires immediate reinstatement with backpay of twenty named strikers and the dismissal of their replacements.

## XI.

### *Revocation of Settlement Agreements*

■ With respect to the Regional Director's June 14, 1977 decision to revoke the three informal settlement agreements he had previously approved, the ALJ concluded:

In view of all the findings of violations of the Act, I find that all the actions of the Regional Director in setting aside the settlement agreements, reopening Cases 1–CA–11856 and 1–CA–11964, and consolidating those cases for trial was a proper exercise of his discretion and authority.

The company argues, "alternatively" to its substantive arguments against the above unfair labor practice findings, that the Regional Director's revocation of the settlement agreements was an abuse of discretion. We find no merit to this argument.

In *Wallace Corp. v. NLRB*, 323 U.S. 248, 254–55, 65 S.Ct. 238, 241–242, 89 L.Ed. 216 (1944), the Supreme Court, after noting the strong policy favoring the settlement of labor disputes, approved the Board's practice of disregarding settlement agreements it had previously approved "where subsequent events have demonstrated that efforts at adjustment have failed to accomplish their purpose, or where there has been a subsequent unfair labor practice." In such cases, the Board is "justified in con-

---

**48.** In addition, Walter Dolbow testified that striker Harold Douglas was recalled to work in March 1979. The ALJ makes no mention of this.

**49.** Despite testimony on the subject by Tribou, Andrew Soule, and Levenson, the basis of SGG company officials' beliefs as to who was and was not working is unclear, and no attempts at direct verification by contacting the affected employees were made. An example is Walter

Dolbow, who was not recalled, despite testimony that he was considered a "first-rate" glazier, on the basis of Andrew Soule's "understanding," based on "some second or third hand source," that Dolbow was working elsewhere.

**50.** Disposition of the present case is without prejudice to any claim that may arise in the future for backpay, under *Laidlaw*, to any striker wrongfully denied reinstatement.

sidering evidence as to [the employer's] conduct, both before and after the settlement." *Id.* This doctrine was later articulated as follows: "[T]he Board may not consider matters properly disposed by a settlement agreement 'unless there is a breach of the agreement or subsequent independent violation of the Act by the parties to the agreement.'" *Rogers Mfg. Co. v. NLRB,* 486 F.2d 644, 648 (6th Cir. 1973), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974), *quoting Lincoln Bearing Co. v. NLRB,* 311 F.2d 48, 50 (6th Cir. 1962).

 By letter of June 14, 1977 the Regional Director informed the company that his investigations of various pending charges had disclosed that "certain terms of the settlement agreement[s] . . . have been violated." Such a finding justifies the Regional Director in setting aside his approval of the settlements and proceeding to issue a complaint on the underlying charges which he had previously found after investigation to have probable merit. There is no allegation that the Regional Director did not act in good faith or that he manipulated the settlement agreements to achieve purposes contrary to the Act. The fact that this court now reverses the Board's findings on several of the relevant unfair labor practices does not make the Regional Director retroactively guilty of abuse of discretion.

## XII.

### *Withdrawal of Recognition*

The ALJ found that the company further violated section 8(a)(5) and (1) of the Act by withdrawing recognition from the union March 25, 1977. On that date Levenson wrote Cohen a letter stating

> The company doubts that Local 1516 continues to represent the bargaining unit at Soule Glass & Glazing Company. Indeed, there is even doubt concerning your representations as the agent of all of the 22 strikers. However, even assuming the desire and eligibility of the 22 in returning, the Company has now made many more than that number of replacements. Our information is that they

have no interest in representation by the Union. . . . The Company, therefore, is herewith withdrawing recognition of the Union as the established bargaining representative for Soule Glass & Glazing Company.

In support of his conclusion that this action violated the Act, the ALJ reasoned as follows:

> [T]he question of the Union's continued majority status [cannot be] raised in the context of unfair labor practices by the Employer designed to cause disaffection from the Union or to gain time in which to undermine the Union's majority. *Celanese Corporation of America,* 95 NLRB 664, 671–672; *Burroughs Corporation,* 180 NLRB 331; *Nu-Southern Dyeing and Finishing, Inc., et al.,* 179 NLRB 573. Thus, against the background of the unfair labor practices found in this Decision the Respondent was in no position to withdraw recognition from the Union, and in doing so violated Section 8(a)(5) of the Act. Furthermore, at the time recognition was withdrawn the Respondent was obligated to bargain in good faith with the Union by virtue of the settlement agreements in these cases, the last of which was approved . . . on March 4, 1977. The Board has held that an employer cannot justify such a refusal to bargain with a certified union within a reasonable time after the execution of a settlement agreement acknowledging its obligation to bargain, since the parties must have adequate time to attempt to negotiate their differences. *Poole Foundry & Machine Co.,* 95 NLRB 34.

### A. *The Legal Standards*

 After the passage of one year from the certification of a union as exclusive collective bargaining representative for a particular bargaining unit, the union enjoys a rebuttable presumption of continued majority. To overcome this presumption, the employer has the burden of demonstrating either (1) that the union in fact no longer has a majority; or, more likely (2) "a reasonable, good faith doubt of the union's

**1110**

majority." *E. g., NLRB v. Crimptex, Inc., supra,* 517 F.2d at 503; *National Car Rental System, Inc. v. NLRB,* 594 F.2d 1203, 1205 (8th Cir. 1979). The employer's doubt must be "reasonably grounded" and "based on objective considerations" to justify refusal to bargain with the union. *Burroughs Corp.,* 180 NLRB 331, 332 (1969). *See NLRB v. Middleboro Fire Apparatus, Inc.,* 590 F.2d 4, 8–9 (1st Cir. 1978) (employee statements of dissatisfaction with union are " 'objective, identifiable acts' on which . . . an employer ought to be able to rely"); R. Gorman, *supra,* at 110–11. Generally, several indicia of loss of majority support are required, and no one factor (*e. g.,* high employer turnover or union "dormancy") is determinative. In reviewing the Board's determination of "reasonable good faith doubt," a court should respect the Board's "seasoned feel for the meaning of events in a labor-management setting," and "may not reverse unless [the court] deem[s] this a case of arbitrariness, irrationality, or abuse of judgment" as to the Board's ultimate conclusion. *Middleboro Fire Apparatus, supra,* 590 F.2d at 9.

■■■■ Although mere high employee turnover is not a sufficient ground to negate a union's presumed majority status, the permanent replacement of striking employees presents a different situation. Striker replacements are

> generally assumed . . . not [to] support the union and . . . ought not to be counted toward a union majority. When such strikebreakers or permanent replacements constitute a majority of the unit, the presumption of union majority is undermined. *Titan Metal Mfg. Co.,* 135 NLRB 196 (1962). But in computing the total workforce within which the majority is to be determined, the replaced economic strikers must be counted, at least during the first twelve months of the strike. *C. H. Guenther & Sons v. NLRB,* 427 F.2d 983 (5th Cir.), *cert. denied,* 400 U.S. 942 [91 S.Ct. 240, 27 L.Ed.2d 246] (1970).

R. Gorman, *supra,* at 112–13 (case citations added). *See National Car Rental, supra,* 594 F.2d at 1206 (quoting Gorman, supra, and holding replacements presumed antiunion).

■■■■ However, an employer's prior unfair labor practices may "estop" it from withdrawing recognition based on good faith doubt, where the employer's own actions have undermined the union's support. As the Supreme Court stated in *Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 687, 64 S.Ct. 830, 834, 88 L.Ed. 1007 (1944) (a unilateral wage increase case),

> [p]etitioner cannot, as justification for its refusal to bargain with the union, set up the defection of union members which it had induced by unfair labor practices, even though the result was that the union no longer had the support of a majority. It cannot thus, by its own action, disestablish the union as the bargaining representative of the employees, previously designated as such of their own free will.

*Accord, NLRB v. Frick Co.,* 423 F.2d 1327, 1333 (3d Cir. 1970). *Compare NLRB v. Cott Corporation,* 578 F.2d 892 (1st Cir. 1978). The Board in *Burroughs Corp.,* 180 NLRB 331, 332 (1969) stated that the employer's good faith doubt "must not have been raised in the context [of] illegal *antiunion* activities, or other conduct by the employer *aimed* at causing disaffection from the union or indicating that in raising the majority issue the employer was merely seeking to gain time in which to undermine the union." (Emphasis added). *Accord, NLRB v. Sky Wolf Sales,* 470 F.2d 827, 830 (9th Cir. 1972). "The existence of an unfair labor practice prior to the refusal to bargain interjects an element of uncertainty about whether the employer thus caused the possible loss of majority. But if it is shown that the unfair labor practice did not significantly contribute to the loss of status, the employer may avoid a bargaining order." *National Cash Register Co. v. NLRB,* 494 F.2d 189, 195 (8th Cir. 1974).

■■■■ Finally, despite a clear loss of majority by the union, an employer may be compelled to continue to bargain with the union for a "reasonable period" by virtue of its entry into a Board-approved settlement

agreement with the union concerning previous unfair labor practice charges. *Poole Foundry & Machine Co. v. NLRB*, 192 F.2d 740, 743 (4th Cir. 1951), *cert. denied*, 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709 (1952); *NLRB v. Vantran Electric Corp.*, 580 F.2d 921, 923–24 (7th Cir. 1978). The rationale is both remedial and contractual. The company's Board-approved agreement to bargain in good faith with the union (a standard feature of § 8(a)(5) settlement agreements) "manifests an administrative determination . . . that some remedial action is necessary to safeguard the public interest[ ] . . . ," *Poole, supra*, at 743; and may be the *quid pro quo* for the union's agreement to withdraw its unfair labor practice charges. *Vantran, supra*, at 924. *See Straus Communications, Inc. v. NLRB*, 625 F.2d 458, 463 (2d Cir. 1980); *NLRB v. All Brand Printing Corp.*, 594 F.2d 926, 931 (2d Cir. 1979).

### B. *Loss of Majority*

 We conclude that the ALJ erred, on this record, in finding that the company's withdrawal of recognition of the union violated the Act. First, the record shows that on March 25, 1977 SGG employed 29 permanent striker replacements hired during the strike, and the strikers numbered only 22. Counting all these employees, it is clear that the replacements constituted a majority. Not only are such replacements not presumed to support the union whose picket lines they have been crossing, but in this case the great majority of the replacements testified that they in fact wanted nothing to do with Local 1516 and preferred a nonunion shop. Absent countervailing factors or the operation of some doctrine of estoppel, this objective numerical fact alone is sufficient to support the company's withdrawal of recognition of the union.

No such countervailing factors or constraints are present here. In contrast to the situation condemned in cases like *Medo* and *Frick, supra*, the company's unfair labor practices, discussed above, cannot be said to have *caused* the union's loss of ma-

jority. Rather, the strike and the company's lawful hiring of permanent striker replacements did so. The union took the risk that the strikers would be permanently replaced, and knew replacements were being hired starting in May, 1976. Having failed in its attempt to clothe its strike in the "protective garment" of an unfair labor practice strike, *cf. NLRB v. Colonial Haven Nursing Home, supra*, 542 F.2d at 706, the union must accept the consequences of its actions.

 Furthermore, as noted above, there has been no showing that the company's actions, including those found to be unfair labor practices, were motivated by antiunion animus. Here, the majority issue was *not*, in the language of the *Burroughs* decision relied on by the ALJ, "raised in the context of unfair labor practices by the Employer designed to cause disaffection with" or undermine the Union's support. 180 NLRB at 332. There is no evidence that any of the four unfair labor practices that we have affirmed affected union support among either the strikers or the replacements, except for the supervisor assault, which actually enhanced union support among the strikers.

### C. *The Settlement Agreement*

We turn next to the settlement agreement, relied on by the ALJ, under the *Poole Foundry* rationale, as an added reason for barring the company from refusing to bargain on March 25. That agreement, signed by the parties on February 4, 1977 and approved by the Board's Regional Director on March 4, 1977, pertained to the union's December 17, 1976 charge regarding the information refusal. The posting notice issued pursuant to the settlement agreement stated in substance that the company would (a) not refuse to bargain collectively with the union, (b) furnish the union with the requested information "pertaining to all employees performing bargaining unit work," and (c) offer reinstatement to any striker not permanently replaced before December 9, 1976 and discharge if necessary any replacements hired between December

9 and the date of compliance with the settlement agreement.[51] No bargaining sessions were held between the time of the settlement agreement and the withdrawal of recognition on March 25, 1977, although the parties did exchange letters regarding the reinstatement request. The settlement agreement was revoked by the Regional Director on June 14, 1977 following his investigation of two of the union's subsequent charges. The company, pursuant to the settlement agreement, furnished the specified information and hired no more striker replacements.

 The company argues that the Board could not rely on the settlement agreement, which the Board itself voided, as the basis for holding the company in violation of the Act. This argument has merit. As a matter of fairness, as well as basic legal principles, the Board in its discretion may elect either to rely upon the agreement and apply sanctions for its violation, including specific enforcement of the agreement to bargain, or it may void the agreement and prosecute the alleged underlying violations. It cannot set aside the agreement, reinstating the previous charges against the employer, and at the same time order compliance in the future with a promise in the voided agreement. Here, the company's obligations under the settlement agreement terminated June 14, 1977. Once the Board elected to revoke its approval of the settlement and proceed to prosecute the underlying charge, it lost the option to enforce terms of the voided agreement. It would be fundamentally unfair to allow the Board to disregard the settlement and compel the company to defend against the information refusal charge, and simultaneously to rely on the settlement to compel the company to bargain when it otherwise would have had no obligation to do so. The Board's action in setting aside the settlement agreement distinguishes the present case from *Poole, All Brand,* and *Straus, supra,* where settlement agreements were

held to bar the employer's withdrawal of recognition.

 We note also the effect of a bargaining order at the present time as a remedy for the company's failure to bargain with the union between March 9 and June 14, 1977. The likely results of this remedy are either to compel the parties to engage in several more months of futile negotiations (accompanied no doubt by a spate of additional unfair labor practice charges and further litigation), or to force unwanted representation upon the current SGG employees (at least pending an election).[52] Even if an agreement were reached between the company and the union, it is unlikely that it would be of any immediate benefit to the replaced strikers. Beyond the *in terrorem* effect of such results on future employers who are thinking of withdrawing recognition of a union (or considering whether to enter into a settlement agreement including a bargaining provision), we fail to see how a bargaining order in this case would serve the public interest in harmonious labor-management relations. Absent an appropriate reason for doing so—*e. g.,* to remedy the employer's previous antiunion conduct or genuine refusal to bargain in good faith—we decline to enforce the Board's bargaining order. For these reasons, we hold that the company did not violate § 8(a)(5) and (1) by withdrawing its recognition of the union.

## XIII.

### *ALJ Bias and Credibility Determinations*

 Absent some showing of abuse, the ALJ is presumed free from bias. His findings on credibility will not be disturbed where the choice is among conflicting testimony or where some adequate reason is given for discrediting a witness. *E. g., NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 843 (5th Cir. 1978).

---

**51.** The record indicates that none of the 29 permanent replacements referred to above was hired on or after December 9, 1976.

**52.** The latter problem was acknowledged, but determined not to have controlling significance, in *Poole* and *All Brand, supra.*

 It is true, as petitioners observe, that the ALJ consistently credited union witnesses (particularly Dolbow) and discredited company witnesses (particularly Levenson) whenever their testimony conflicted as to the events at the various bargaining sessions.[53] However, we find no merit in petitioners' allegation that the record demonstrates that bias of the ALJ against the company deprived them of a fair trial. The ALJ may credit the General Counsel's witnesses in preference to those of the employer, *Banner Biscuit Co. v. NLRB*, 356 F.2d 765, 768 (8th Cir. 1966), and here the ALJ gave adequate reasons for the majority of his credibility determinations. Although the record and the ALJ's decision do at times appear to indicate a certain hostility or impatience by the ALJ toward the company and its counsel, cf. *Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 795 (7th Cir. 1979); *Caribe General Electric Inc. v. NLRB*, 357 F.2d 664, 665–66 (1st Cir. 1966), we find no indication that this apparent attitude in any way affected the fairness of the hearing or the integrity of the record.

 As the length of this opinion indicates, many of the issues were close ones. The facts that the ALJ found for the General Counsel and against the company in all but one instance (the firing of David Bates) and that we have reversed a number of those findings do not, without more, show bias. Notwithstanding the protestations of a disappointed litigant, "rejection of an opposed view, even if total, 'cannot of itself impugn the integrity of a trier of fact.'" *NLRB v. Phaostron Instrument & Electronic Co.*, 344 F.2d 855, 859 (9th Cir. 1965); see *NLRB v. Superior Sales, Inc.*, 366 F.2d 229, 233 (8th Cir. 1966).

## XIV.

### The Nature of Review In This Case

This case does not present issues of first impression. Nor is it a case where the

---

**53.** The ALJ's overall evaluation of the respective credibility of Dolbow and Levenson and the factors on which his conclusions were based are set forth in the following passage: By far the greater amount of testimony concerning the actual bargaining was adduced by Walter Dolbow and Alan J. Levenson.... Walter Dolbow impressed me as an honest witness who was attempting to remember as best he could the events which occurred at each of a long series of negotiating meetings which ended almost a year prior to his appearance as a witness. Considering the fact that Dolbow testified entirely without the use of notes, he displayed a remarkable ability to remember detail, and, except where otherwise indicated, was a credible witness for the General Counsel. Alan J. Levenson, Esq., on the other hand displayed a poor independent memory concerning what transpired at the bargaining table, despite his status as the Respondent's chief negotiator and labor relations counsel, and found it necessary, for the most part, to rely on notes while testifying about the bargaining sessions. In addition, as did his father Mayo Levenson, Esq. when he testified, Levenson frequently departed from a precise exposition of the facts, and launched into self serving speeches concerning his thought processes and conclusionary assertions about Respondent's good intentions. In addition, when serving at the hearing in the other of his dual capacities as Respondent's chief trial counsel, Levenson adduced much testimony from important witnesses for the Respondent including Charles Soule, Edward Churchill, and Andrew Soule, through the repeated use of leading questions supplying answers relating to crucial issues, despite admonishments from the bench. I have thoroughly and carefully considered all of the above factors in writing this Decision, particularly concerning the findings of fact relating to Respondent's conduct during the negotiations.

Although we decline to disturb the ALJ's credibility determinations, we note that (a) on the first day of the hearing the ALJ told Levenson he *was* permitted to ask Charles Soule leading questions; (b) Dolbow *did* have "notes on every meeting," which the ALJ explicitly permitted Dolbow "to utilize ... while testifying concerning the negotiating sessions" in order to refresh his recollection, and Dolbow did consult and refer to his notes at several points in the record; (c) Dolbow's testimony was not free of self-serving statements, including a categorical denial of any knowledge of any violence by strikers against the company or any mention of the subject during the negotiations ("The only violence I know of was caused by you people up in Bangor ....") and asserting legal conclusions regarding the company's "unilateral" actions; and (d) the ALJ became increasingly impatient and irritated with Levenson's slow interrogation of witnesses, and on several occasions reprimanded Levenson for delaying the proceedings.

court has reached out and intruded upon responsibilities assigned to the Board. We would have been happy to defer had the Board, applying its day-to-day familiarity with the labor law, arrived at its own findings explained by analysis of the issues and the evidence. Instead, the Board summarily affirmed the ALJ's decision, with only a single minor modification of the resulting order. Surely in some instances an ALJ's decision merits summary affirmance. This was not such a case.

The need for full examination of the issues and the evidence in this case has necessarily led us to review comprehensively the decisions in numerous areas of labor law. Our statements of the law in these areas are not an effort to revise or reshape the existing law. They are meant only to indicate the bases upon which we have proceeded in resolving the issues before us. There is always some risk that such extensive statements of the law may later be seized upon as fraught with significance in contexts for which they were not framed. We explicitly state that we do not regard our summaries of the law in these various areas as exhaustive, much less as intended to supersede or modify the underlying precedent in this Circuit and elsewhere.

## XV.

### Remedy

■■■ Under section 10(c) of the Act, 29 U.S.C. § 160(c), the Board has broad discretion in fashioning appropriate remedies which will "effectuate the policies of this [Act]." Where the Board has found a party guilty of an unfair labor practice and that finding is affirmed, the reviewing court is required to grant great deference to the Board's remedial order and will not disturb it "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568 (1943); *Fibreboard, supra*, 379 U.S. at 216, 85 S.Ct. at 405. However, it is also plainly true that where the court reverses the un-

derlying unfair labor practice finding, the corresponding remedy will not be enforced. Also, it is implicit in "abuse of discretion" review that the remedy must be in reasonable proportion to the violation; a *de minimis*, technical, or marginal violation of the Act cannot properly support a broad, draconian remedy.

In this opinion we have sustained four of the Board's findings of unfair labor practices: the wage increase, § 8(a)(1); the supervisor strike misconduct, § 8(a)(1); the unilateral transfer of bargaining unit work to SGR, § 8(a)(5) and (1); and the refusal to provide certain portions of the requested information, § 8(a)(5) and (1). We have held that the proved violations did not convert the strike, that the strikers were therefore economic strikers entitled only to preferential reinstatement whenever jobs become available, that the finding that the company was guilty of an unlawful course of conduct or overall bad faith bargaining was neither tried nor proved, and that the findings that the company's acts were intended to disparage, undermine, or discriminate against the union and its adherents or were otherwise motivated by unlawful anti-union animus were not supported by substantial evidence.

■■■ In this context, we hold that the only appropriate remedies for the proved violations are a cease and desist order and an order for a posting notice. It is appropriate that the order include directives that the company cease and desist from the first two of the above unfair labor practices, and that it post notice of the type ordered by the Board, agreeing to do the same. The otherwise-justified provisions of the cease and desist order relating to the information refusal and diversion of bargaining unit work, and the corresponding affirmative remedial measures designed to benefit the union and restore the *status quo ante* (*i. e.*, providing additional information and restoring the lost work to the bargaining unit) are and will remain moot unless the union regains its status as bargaining agent. However, in order that these violations of the Act not go wholly unredressed, we di-

rect that the notice posted also disclose the Board's determination of the latter two violations.

We realize that those parts of the Board's order that we have found sustainable impose quite limited sanctions. Indeed, an objection may be voiced that what remains to be enforced will have little practical impact because, as a result of its unsuccessful economic strike, the union no longer has the status of collective bargaining representative. This is an outcome, however, which neither we nor the Board can properly avoid; it is a consequence of legally permissible economic conflict, not unfair labor practices.

For the above reasons, we enforce only the provisions of the Board's Order requiring petitioners to cease and desist from the following actions (with appropriate modifications and deletions to eliminate language inconsistent with this opinion): [54]

(a) Assaulting employees because of their participation in a strike or other union or protected concerted activities.

(b) Offering employees raises or other inducements to return to work and cease participating in a strike or other union or protected concerted activities.

\* \* \* \* \* \*

(e) Granting wage increases to other employees in excess of what is offered to ... *union members or supporters, where the timing and amount of such increases is reasonably calculated to communicate to union members or supporters that it does not pay to support a union or participate in union activities, or which otherwise tends to restrain, coerce or interfere with employees' freedom of choice as to unionization and other protected activities.*

In addition, statements to the following effect shall be included in the notice to be posted by the company.

In addition to the above, the Company has been found guilty of the following violations of the National Labor Relations Act against Glaziers Local Union 1516:

(a) Unilaterally changing the type and amount of work of bargaining unit employees, by diverting outside glass replacement work to Soule Glass Replacement Company, without prior notice and bargaining.

(b) Failing and refusing to furnish promptly to the union, on request, adequate relevant information concerning the wages and hours of striker replacement employees and others performing bargaining unit work, necessary to the performance of the union's function as collective-bargaining representative.

In all other respects enforcement of the Board's order is denied.

---

**54.** Our deletions are indicated with an ellipsis (...) and our additions appear in italics.